G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 001394
D. CHRIS ALBRIGHT, ESQ.
Nevada Bar No. 4904
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada 89106
Tel: 702.384.7111
Fax: 702.384.0605
gma@albrightstoddard.com
dca@albrightstoddard.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JOSEPH M. DROPP, MARY E. DROPP, ROBERT LEVINE, SUSAN LEVINE, and KAARINA PAKKA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DIAMOND RESORTS INTERNATIONAL, INC.; DIAMOND RESORTS HOLDINGS, LLC; DIAMOND RESORTS CORPORATION; DIAMOND RESORTS INTERNATIONAL CLUB, INC., a/k/a THE CLUB OPERATING COMPANY; DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC; DIAMOND RESORTS U.S. COLLECTION MEMBERS ASSOCIATION; APOLLO MANAGEMENT VIII, L.P., APOLLO GLOBAL MANAGEMENT, LLC, MICHAEL FLASKEY; and KENNETH SIEGEL,<br><br>Defendants. | CASE NO.:<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**COME NOW** Plaintiffs JOSEPH M. DROPP, MARY E. DROPP, ROBERT LEVINE,

SUSAN LEVINE, and KAARINA PAKKA (the "Plaintiffs"), by and through their undersigned

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

attorneys, and bring this action on behalf of themselves and all persons similarly situated, against Defendants DIAMOND RESORTS INTERNATIONAL, INC.; DIAMOND RESORTS HOLDINGS, LLC; DIAMOND RESORTS CORPORATION; THE CLUB OPERATING COMPANY; DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC; DIAMOND RESORTS U.S. COLLECTION MEMBERS ASSOCIATION; DIAMOND RESORTS HAWAII COLLECTION DEVELOPMENT LLC; and DIAMOND RESORTS HAWAII COLLECTION MEMBERS ASSOCIATION (collectively "Diamond" or "DRI"), APOLLO MANAGEMENT VIII L.P. and APOLLO GLOBAL MANGEMENT, LLC (collectively, "Apollo"), and MICHAEL FLASKEY and KENNETH SIEGEL (collectively "Individual Defendants," and together with DRI and Apollo the "Defendants"), based on personal knowledge with respect to themselves and, on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters, and complain and allege as follows:

## NATURE OF THE CASE

1.     This action arises out of Defendants' sale of unregistered securities in violation of Section 5(a), 5(c), 12(a)(1), and 15(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77*l*(a)(1) & 77o(a).  Sections 5(a), 5(c), and 12(a)(1) require that any securities sold in the United State be registered with the United States Securities and Exchange Commission ("SEC").

2.     Diamond is in the business of selling "points," which are marketed to prospective purchasers as an investment which will appreciate in value and can be easily resold.  These "points" are aggregated in exchange pools.  Every purchaser of points simultaneously becomes a member of one or more vacation Associations or Clubs, which enables the owner of the points to reserve rooms in one of Diamond's resort or hotel properties.  Diamond sells points to new point purchasers, as well as existing owners, in person, at sales centers in several Diamond resorts throughout the United States.

3.     The common practice utilized by the Diamond sales operation throughout the United States is as follows:  Prospective purchasers (including new purchasers as well as existing

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

owners to whom Diamond seeks to sell additional points) are typically provided with some kind of conditional benefit or incentive, such as a gift certificate, free vacations, free tickets to shows or a reduced room rate at a condominium or hotel.  In order to realize such a benefit, the prospective purchaser is required to attend a 60 to 90 minute sales presentation.  No contract or other official DRI document describing the terms of the point investment is provided to the prospective purchasers until the time of closing.

4.    Prospective purchasers are organized by DRI depending upon their characteristics and the perceived likelihood that they will agree to purchase points. DRI then assigns these prospective purchasers to work with DRI salespeople who are also called vacation counselors.  The sales presentations exceed 90 minutes and often last five to six hours in length or longer. Moreover, DRI tells prospective purchasers that they will forfeit their benefits if they leave the sales presentation before the respective salespeople agree that the presentation is over.  Prospective purchasers are not permitted to take any contract, information sheets, Purchase and Security Agreements ("PSAs" or "Agreements"), Credit Sales Contracts, notes, or other written materials with them off premises prior to closing, nor are prospective purchasers given time to consult with their own advisors, attorneys or any other person during the sales presentation.

5.    DRI salespeople's common practice is to pitch the points to prospective purchasers (including Plaintiffs and the other members of the Class) as more than just a way to vacation.  Rather, DRI pitches its points as an investment that will appreciate in value due to continuing improvements made by Diamond in the quality and number of its resort and hotel properties, the general appreciation of real estate in the future and the managerial skill that DRI provides in operating the properties it holds in its Collections.  DRI salespeople tell their unwitting targets – over the course of hours-long, high pressure sales pitches – that, by purchasing points "now," the purchasers will receive a discounted purchase price that is only available on the day of the sales presentation; they are investing in their future; their points will increase in value; they can use their points to pay annual maintenance fees; they can bequeath the points to their heirs as an inheritance;

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

and they can sell their points – at a profit – at any time. Thus, these "points" are actually investment contracts, and therefore securities, under the United States securities laws.

6.  Once the prospective purchasers succumb to the sales pitches and agree to purchase points, they are individually shepherded to a sales center "quality control" person (or otherwise labeled individual), whose job it is to obtain the purchaser's signature on a lengthy, densely-worded sales contract (the PSA) and to instruct the purchaser to initial numerous items on a lengthy information sheet (often the initials are generated electronically by the sales people for the purchasers' "convenience"). In reality, purchasers are not given sufficient time to read the documents, nor are they permitted to take the documents with them off premises before the closing, nor may purchasers discuss the terms and conditions of the PSAs, and/or any other contracts or documents given to them by DRI with any other person prior to signing and initialing these documents. Moreover, by the time that the typical purchaser goes through the closing process, he or she is too exhausted to read or understand the provisions of these documents and is not capable, by training, to understand the substance or legal ramifications of executing them. The closing documents contradict parts of what the prospective purchasers are told and/or shown during the sales presentations.

7.  Many of DRI's point purchasers are induced to buy tens of thousands of points, representing many weeks of vacations that the typical purchaser could never possibly utilize. These points can cost hundreds of thousands of dollars, and the purchases are often financed by DRI at credit card interest rates. In addition, the points are accompanied by an obligation to pay yearly "maintenance" fees for use of the various resorts found in the particular Collection the purchaser bought into. Maintenance fees have risen at a rate far higher and faster than ordinary inflation despite the economies of scale that DRI has in place to manage its properties. As such, a common complaint by purchasers is that maintenance fees have become unaffordable over time. DRI is allowed to increase maintenance fees by as much as 25% per year. As a result, existing point investors or members are often induced to purchase additional points in order to reach "preferred" thresholds. DRI tells these point purchasers or members that if they buy more points,

the DRI member will no longer be required to pay "maintenance" fees. By way of example, DRI investors are told that by becoming platinum members (platinum members own 50,000 or more points), the investors may redeem their points at the rate of 30 cents each to pay for maintenance fees. Since maintenance fees are currently approximately 18 cents each, the DRI investor is told that he or she can actually profit "off the spread" by purchasing more points. However, when DRI investors try to redeem points, they discover that there is no such program in place.

8.      Unfortunately for Plaintiffs and other Class members, Defendants' sales pitches regarding the investment value of the points are false.  DRI points do not increase in value, there is no viable secondary market for them, and DRI severely restricts the resale of points.  Rather than receiving a return on their investment, Plaintiffs and other Class members are on the hook for massive annual maintenance fees that keep going up and up each year.  This is in addition to the exorbitant cost of the points themselves (and any interest payments thereon).  Moreover, these DRI contracts or PSAs last in perpetuity. There is no way for the DRI member to sell their membership. In fact, DRI memberships are liabilities not assets.

9.      The Securities Act of 1933 requires all sellers of securities to register those securities with the Securities and Exchange Commission ("SEC") to prevent precisely the types of abuses perpetrated by Defendants in connection with the sale of their "points."  The Securities Act was passed in response to the stock market crash of 1929, which was caused in part by issuers selling stocks or other investments based on false representations, without disclosure of material information, and/or without and continuing reporting obligations.  Investors had no way of knowing whether they were receiving an interest in a meaningful enterprise, or a stock certificate that was not worth the paper it was printed on. In response to this disaster, Congress passed the Securities Act to require that all securities sold in the United States be registered with the SEC.

10.      Defendants are selling purchasers investment contracts, and hence securities, even if they are not explicitly described as such and even though the written contracts contradict in part the promises of the sale pitches.  Defendants have not followed the registration requirements under

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1  the securities laws and SEC regulations, and thus, they have violated and are in continuing

2  violation of the Securities Act of 1933.

3  <center>**THE PARTIES**</center>

4  **I.    PLAINTIFFS**

5     **A.    Plaintiffs Joseph and Mary Dropp**

6       11.    Plaintiffs JOSEPH M. DROPP and MARY E. DROPP (the "Dropp Plaintiffs") are

7  a married couple who, at all times relevant hereto, were and are residents of Hornell, New York.

8       12.    On August 6, 2016, the Dropp Plaintiffs purchased 8,500 points in the Diamond

9  Resorts U.S. Collection for a price of $25,710 following a sales pitch they received in the sales

10 office of DRI in Virginia.

11      13.    On November 9, 2016, the Dropp Plaintiffs purchased 50,000 additional points in

12 the Diamond Resorts U.S. Collection for a price of $140,000, following a sales pitch they received

13 in the Las Vegas sales office of DRI.

14      14.    The DRI salespeople represented to the Dropp Plaintiffs that their points were tied

15 to real property, that the points would increase in value over time as a result of efforts bestowed

16 by DRI, that the points could be sold for a profit, and that the Dropp Plaintiffs could bequeath the

17 points to their heirs.

18      15.    The Dropp Plaintiffs purchased these points in reliance upon the DRI salespeople's

19 representations.

20     **B.    Plaintiffs Robert and Susan Levine**

21      16.    Plaintiffs ROBERT LEVINE and SUSAN LEVINE (the "Levine Plaintiffs") are a

22 married couple who, at all times relevant hereto, were and are residents of West Hills, California.

23      17.    On October 25, 2016, the Levine Plaintiffs purchased 30,000 points in the Diamond

24 Resorts Hawaii Collection for a price of $84,650 following a sales pitch they received in the sales

25 office of DRI in Kona, Hawaii.

26

27

28

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

18. On May 11, 2017, the Levine Plaintiffs purchased 25,000 points in the Diamond Resorts U.S. Collection for a price of $71,250 following a sales pitch they received at the Miami sales office of DRI.

19. On July 11, 2017, the Levine Plaintiffs purchased 50,000 points in the Diamond Resorts U.S. Collection for a price of $144,000 following a sales pitch they received at the Las Vegas sales office of DRI.

20. The DRI salespeople represented to the Levine Plaintiffs that their points were tied to real property, that the points would increase in value over time as a result of efforts bestowed by DRI, that the points could be sold for a profit, and that they could bequeath the points to their heirs.

21. The Levine Plaintiffs purchased their points in reliance upon the DRI salespeople's representations.

**C.   Plaintiff Kaarina Pakka**

22. Plaintiff KAARINA PAKKA ("Plaintiff Pakka") is an individual who, at all times relevant hereto, was a resident of Ontario, Canada.

23. On November 16, 2016, Plaintiff Pakka purchased 50,000 points in the Diamond Resorts Hawaii Collection for a price of $175,356, following a sales pitch she received in the Maui sales office of DRI.

24. The DRI salespeople represented to Plaintiff Pakka that her points were tied to real property, that the points would increase in value over time as a result of efforts bestowed by DRI, that the points could be sold for a profit, and that she could bequeath the points to her heirs.

25. Plaintiff Pakka purchased these points in reliance upon the DRI salespeople's representations.

**II.   DEFENDANTS**

26. Defendant DIAMOND RESORTS INTERNATIONAL, INC. ("DRII"), is a Delaware corporation and has a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. Prior to September 2, 2016, DRII was a publically-held

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1  company.  On September 2, 2016, DRII was merged into, and therefore acquired by, a fund

2  managed by Defendant Apollo Management VIII, L.P., which is controlled by Defendant Apollo

3  Global Management, LLC, in an all-cash transaction.  Since September 2, 2016 – the date this

4  "going private" transaction was consummated – DRII and all of its various affiliates and

5  subsidiaries have been owned and controlled by Apollo.

6       27.    Defendant DIAMOND RESORTS HOLDINGS, LLC ("DRH"), is a Nevada

7  limited liability corporation with a principal place of business located at 10600 West Charleston

8  Boulevard, Las Vegas, Nevada 89135.  DRH is a subsidiary of DRII, and is the parent of DRC.

9       28.    Defendant DIAMOND RESORTS CORPORATION ("DRC"), is a Maryland

10  corporation with a principal place of business located at 300 E. Lombard Street, Baltimore,

11  Maryland 21202.  DRC is a subsidiary of Defendant DRH.  DRC owns Defendant THE Club.

12       29.    Defendant DIAMOND RESORTS INTERNATIONAL CLUB, INC. ("THE Club

13  Operating Company" or "THE Club"), is a Florida corporation with a principal place of business

14  located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  Defendant Diamond

15  Resorts International Club does business under the name THE Club Operating Company.  THE

16  Club is wholly owned by Defendant DRC.

17       30.    Defendant DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC

18  (the "U.S. Collection"), is a Delaware limited liability corporation with a principal place of

19  business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  The U.S.

20  Collection is an affiliate of DRII.  When a member-investor purchases membership in the U.S.

21  Collection Association, he or she enters into a purchase and security agreement with the U.S.

22  Collection.

23       31.    Defendant DIAMOND RESORTS U.S. COLLECTION MEMBERS

24  ASSOCIATION ("the U.S. Collection Association"), is a non-stock, non-profit Delaware

25  corporation with a principal place of business located in Clark County, Nevada.  When a member-

26  investor purchases "points" in DRI's U.S. Collection, he or she is purchasing membership in the

27  U.S. Collection Association.

32.     Defendant DIAMOND RESORTS HAWAII COLLECTION DEVELOPMENT, LLC (the "Hawaii Collection"), is a Delaware limited liability company with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. The Hawaii Collection is an affiliate of DRII.  When a member-investor purchases membership in the Hawaii Collection Association, he or she enters into a purchase and security agreement with the Hawaii Collection.

33.     Defendant DIAMOND RESORTS HAWAII COLLECTION MEMBERS ASSOCIATION (the "Hawaii Collection Association"), is a non-stock, non-profit Delaware corporation with a principal place of business located in Clark County, Nevada.  When a member-investor purchases "points" in DRI's Hawaii Collection, he or she is purchasing membership in the Hawaii Collection Association.

34.     Defendant APOLLO MANAGEMENT VIII, L.P., is a Delaware limited partnership with a principal place of business in New York, New York.  Apollo Management VIII, L.P. is an affiliate of Defendant Apollo Global Management, LLC.  Apollo Management VIII, L.P. manages the funds, also owned by Apollo Global Management, that in turn own Diamond Resorts International following its acquisition by Apollo on September 2, 2016.

35.     Defendant APOLLO GLOBAL MANAGEMENT, LLC, is a Delaware limited liability corporation with a principal place of business in New York, New York.  Apollo Global Management is a private equity fund that, through its affiliates, including Defendant Apollo Management VIII, L.P., currently owns of Diamond Resorts International, following Apollo's acquisition of DRI on September 2, 2016.

36.     Defendant MICHAEL FLASKEY, is the Chief Executive Officer of DRII.  He has held senior leadership positions within DRII since 2010, serving as Executive Vice President of Sales and Marketing, North America, and Executive Vice President and Chief Sales and Marketing Officer, and Chief Operating Officer.  He has served as CEO since March 2017.

37.     Defendant KENNETH SIEGEL, is the President and Chief Administrative Officer of DRII.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

### JURISDICTION AND VENUE

38.    This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 77*l*, and 28 U.S.C. § 1331 for Plaintiffs' claims arising under the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* (the "Securities Act"); and pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C. § 1332(d)(1)(B), in which a member of the putative class action is a citizen of a different state than the Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

39.    Venue is proper in the District of Nevada pursuant to 28 U.S.C. § 1391(b) because acts giving rise to Plaintiffs' claims occurred within this judicial district; DRII, DRH, THE Club, the U.S. Collection, the U.S. Collection Association, the Hawaii Collection, and the Hawaii Collection Association have their principal places of business in this judicial district; and all Defendants regularly conduct business in and have engaged and continue to engage in the wrongful conduct alleged herein – and thus, are subject to personal jurisdiction – in this judicial district.

### FACTUAL ALLEGATIONS

40.    DRI purports to be in the vacation business, but in reality, it is in the investment business – specifically, the business of selling unregistered, illiquid securities in the form of exchange pools of "points", using high pressure sales techniques.    DRI sells its "points" as an "investment," when, in reality, all the "points" provide (other than an opportunity to try to book rooms at resorts and hotels, which can be done without purchasing points) is a source of debt for DRI's investor-members, who must pay onerous maintenance fees and/or borrow money from a DRI affiliate in order to own and continue to own these points.    At high-pressure, mandatory sales presentations, DRI salespeople convince investor-members that DRI's points (i) appreciate in value; (ii) can be readily sold;  (iii) are a hedge against inflation; and (iv) constitute an appreciating asset that DRI members can pass along to their children. These representations are false.

### I.    DRI'S BUSINESS MODEL

41.    DRI's investment scheme is premised upon a convoluted system of "vacation ownership interests" ("VOI").    DRI is commonly thought of as a "timeshare" company, but it does

1 not sell traditional timeshare interests, and indeed, does not refer to itself as such.

2  42. In a traditional timeshare model, the timeshare owner purchases the right to use the

3 particular timeshare property in question for a certain number of weeks per year. The timeshare

4 owner may choose to utilize an exchange program that allows them to swap their weeks at a

5 particular resort with another time share owner's weeks at another resort, but his or her ownership

6 interest is in a particular resort, for a particular period of time. Indeed, Nevada law protects

7 timeshare owners in this respect by prohibiting timeshare companies from selling more than 365

8 use-days in any particular timeshare property in any particular year. *See* Nev. Rev. Stat.

9 §§ 119A.525(1)(c); 119A.307(3)(h).

10  43. Although investor-members purchasing points in Nevada are provided a form

11 stating that the DRI salesperson is a licensed real estate agent who has a fiduciary duty to disclose

12 all facts material to the transaction, DRI points are in no way tied to the value of any real estate,

13 and DRI investor-members are not purchasing an interest in real estate, as described in further

14 detail below.

15  44. DRI's points provide nothing more than an opportunity to attempt to reserve rooms

16 at various properties during various times of the year. DRI has developed a matrix that sets forth

17 how many points are required to reserve a room at each of its properties, a calculation that factors

18 in the location, size of the room, time of year, and how far in advance reservations are made.

19 However, because the points are not tied to a right to use a particular property for a particular

20 period of time, as a traditional time share does, investor-members are not "guaranteed" access to

21 any particular resort or property at any particular time, no matter how many points they own.

22 Instead, DRI doles out rooms on a first come, first serve basis. As such, there is no guarantee that

23 Diamond members will ever be able to vacation where or when they want to.

24

## II. THE CONVOLUTED RELATIONSHIP BETWEEN DRI, THE CLUB, AND THE U.S. AND HAWAII COLLECTIONS

25  45. Investor-members who purchase points from DRI are actually purchasing

26 membership in a particular "Diamond Collection." There are nine Diamond Collections located

27

28

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

throughout the world, including the U.S. Collection, which consists of interests in resorts located in Arizona, California, Colorado, Florida, Indiana, Missouri, Nevada, New Mexico, South Carolina, Tennessee, Virginia, and St. Maarten, and the Hawaii Collection, which consists of interests in resorts that are primarily located in Hawaii.

46. According to the Purchase and Security Agreement (the "PSA") that an investor-member must sign in order to purchase points in the U.S. Collection, the investor purchases a membership in one of several "Homeowners' Associations" in the U.S. Collection. An investor-member signs a "Credit Sales Contract" to buy into the Hawaii Members Association for the Hawaii Collection. The PSA further provides that "the basis for the Membership is certain real property interests in various resorts, hotels, and other vacation properties and that title to those interests is held in a trust for the benefit of the Association." In other words, the investor has no direct ownership interest in any real property, as he or she would in a traditional time share arrangement. Instead, the real property is owned by or held by the trust, for the benefit of an Association in which the investor is a member solely by virtue of his or her ownership of points.

47. Each Association is administered through a board of directors elected by members – but crucially, DRI owns a "significant number of points"[1] in each Collection, which points are weighted, thereby enabling DRI to control the votes electing the boards of directors for each Association. Indeed, this is evidenced by the fact that the board of every single Association has hired DRI to provide management services for the Association – services for which DRI receives substantial fees.

48. In addition, each investor-member who purchases points in a Collection is simultaneously enrolled in an entity known as "THE Club" which is a trade name used by DRI.

---

[1] *See* DRII Amended Annual Report on Form 10-k for the year ending Dec. 31, 2015, filed with the S.E.C. on August 8, 2016 (the "DRI 10-k"), at 13. This was the last annual report on Form 10-k filed with the SEC by DRII before its acquisition by Apollo. Since Apollo took DRII private, it no longer has SEC filing obligations.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1  All investor-members who purchase/invest in a U.S. or Hawaii Members Association are

2  automatically enrolled in THE Club.

3       49.     THE Club is a wholly owned subsidiary of DRI.

4       50.     THE Club operates the exchange pool of points.  "Points" are defined as "the

5  symbolic currency utilized by THE Club Operating Company to quantify the reservation, use

6  and/or other rights of a Member based on the Member's Qualifying Interest."  In turn, "Qualifying

7  Interest" is defined as

> (a) an interest in an Affiliated Resort, in an Affiliated Collection or in some other program or system entitling the owner thereof to the use or occupancy or both of an Accommodation or to obtain an Other Redemption Opportunity, including but not limited to (i) a fee simple estate, an estate for years, or some other ownership interest in real property coupled with a right to occupy an Accommodation or one of a group of Accommodations in that real property according to the applicable Declaration, (ii) a leasehold or "right to use" interest, or other contractual right to use or occupy an Accommodation or one of a group of Accommodations or to obtain an Other Redemption Opportunity, (iii) "points' or any other medium symbolically representing the right to use or occupy an Accommodation or one of a group of Accommodations or to obtain an Other Redemption Opportunity, or (b) such interest as THE Club Operating Company may choose to accept in connection with bestowing membership on the owner or holder thereof from time to time in accordance with the provisions of these Articles.[2]

17       51.     Although "points" in THE Club are defined as quantifying a member's "Qualifying

18  Interest," a "Qualifying Interest" may itself be based on the points purchased to become a member

19  of an Association.

20       52.     In other words, there are two points systems at play – the points an investor-member

21  is assigned when he or she purchases a membership in the Association, and the points he or she is

22  assigned in "THE Club."

23       53.     Of course, these nuances are never explained to investor-members, including

24  Plaintiffs and the Class, during the high pressure sales pitch DRI utilizes to induce them to

25  purchase points.

27  _____

28  [2] *See* THE Club Articles, May 2015, at 40.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

54.     The convoluted relationship among the various legal entitles is set forth in this chart from DRI's most recent Form 10-k filing with the SEC.:



*See* DRI 10-k at 20.  The relationships among these entities as set forth in this Form 10-k filing are not explained to points purchasers, nor provided to them in written form during the sales presentation or closing.

## III.     THE POINTS HAVE NO INTRINSIC VALUE

55.     THE Club is described as an exchange pool of points.  DRI describes this system in sale pitches as permitting investor-members to utilize their points to reserve rooms at resorts all over the world, and therefore not being limited to resorts or hotels within the U.S. Collection.  However, because there is no cap on how many investor-members can join THE Club, or the Association, and therefore DRI reserves the right to, and does, add additional points to THE Club from time to time, it is impossible for any investor-member to quantify the vacation stays available to the investor-member by virtue of his or her point ownership or otherwise determine  the value

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

of his or her investment, especially since these values can change, and do change, based upon how many points the DRI sales operation is able to sell.

56.     In fact, rooms at DRI resorts are doled out on a first come, first served basis, meaning that many investor-members cannot vacation when and where they want despite DRI's sales pitch that a points-based model offers members greater flexibility than a traditional timeshare model.  Thus, many investor-members end up using their points to book vacations at less desirable locations, and/or during off-peak seasons.

57.     Thus, it is impossible to determine what the "face value" of a "point" in the U.S. Collection exchange pool is worth, and even if it were possible to make this determination, the value of a "point" is diluted any time additional points are sold – a common occurrence, because virtually every investor-member is purchasing "new" points.

58.     Further, there is no secondary market for the "points," and DRI's universal practice is to refuse to buy back points (except by foreclosure), so it is impossible to determine a "market value" of any investor's interest.

## IV.   THE ONEROUS, ONGOING COST OF DRI POINTS AND ITS RELATIONSHIP TO DRI'S BUSINESS MODEL

59.     While it is difficult, if not impossible, to ascertain the value of DRI points, it is possible to calculate their cost.  Investment in DRI "point" exchange pools comes at a high price in the form of Club dues and fees, including (a) a yearly Club Fee, the amount of which is a function of the Member's membership class (or a base fee), plus an amount based on the number of points owned, to cover the costs of Club management; (b) a Property and Services Fee, in an amount to be determined by the Club, to cover the costs relating to the represented services provided by THE Club; (c) closing costs at the time of sale; and (d) "Other Charges," to cover "any expenses associated with the operation of THE Club which are not covered" in the various other fees.

60.     The Club Fee represents a significant source of income for DRI. DRI also collects a property "management fee" of 10-15% per year of the costs of operating any resort in a Diamond

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Collection. DRI's revenue from property management contracts increases to the extent that (a) operation costs at managed resorts rise, and consequently, management fees increase proportionately under the cost-plus fee arrangements; (b) DRI adds services under their management contracts; or (c) DRI acquires or enters into contracts to manage additional resorts. In other words, the more investor-members are charged fees for the cost of operating an Association, the more revenue DRI generates. Moreover, the DRI property management contracts renew automatically each year.

61.    In addition to the income generated from fees, DRI generates significant revenue from financing the sale of its points. Many of DRI's investors are unable to purchase their points – which can range from costing a few thousand dollars to tens, or even hundreds, of thousands of dollars – in cash up front. Thus, DRI offers financing, from DRI's financing affiliate, to the investors by loaning them money to purchase the points. Those loans are secured by the points themselves as provided under article 9 of the Uniform Commercial Code.

62.    DRI's financing is a substantial source of DRI's business. Between January 1, 2011 and December 31, 2015, DRI financed 74.5% of all its Membership sales (i.e., sales of points).[3] According to the restated financial statements contained in the DRI 10-k, DRI sold $624,283,000 of vacation interests (including all financed sales) in 2015.

63.    DRI's loans to investor-members are a crucial component of its business model. In order to maintain the liquidity to support its lending to purchasers, DRI relies upon a $100 million loan sale facility with Quorum Federal Credit Union. As DRI stated in its final 10-k filing, "[o]ur ability to borrow against or sell our consumer loans has been an important element of our continued liquidity… In the past, we have sold or securitized a substantial portion of the consumer loans we originated from our consumers."[4]

---

[3] See DRII 10-k, Dec. 31, 2015, at 32.

[4] DRI 10-k, Dec. 31, 2015, at 32.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

64.     Thus, DRI relies on its ability to use its outstanding loans to member-investors as collateral in order to borrow enough money to facilitate selling more points – and therefore issuing more loans – to new member-investors.   As described by Southern Investigative Reporting Foundation in an investigative analysis of DRI's business model:

> [DRI] cannot survive on the amount of cash sales it makes, so it needs to finance sales.  [DRI] has to securitize those loans to bring cash in the door or run the risk of losing money on every sale.  To retain favorable terms for monetizing its debt, the company has to use its own cash to make up shortfalls in the securitization pools.  Since the realized value on customers' loans is less than the amount [DRI] has borrowed against them, it needs to monetize new loans faster and faster.[5]

65.     Like most other components of the DRI investment scheme, what is presented as a wise investment is actually a tremendous expense.  Unlike an interest rate for a home mortgage, for example, DRI financing is set at credit card interest rates, which can be as high as 22% per annum.  Various other protections which exist as part of the underwriting process for homebuyers likewise do not apply to sales of ephemeral "points," such as affordability measures like debt to income ratios.

66.     While mortgage interest payments are often tax deductible, interest payments on "points" are not.  Despite this, and despite the fact that DRI investors do not actually hold any fee simple ownership interest in any real property, DRI sent IRS Form 1098 to investors for all calendar years through 2015.  Form 1098 is the IRS form provided by a lender to a mortgagor setting forth the amount of mortgage interest (which is generally deductible) paid in a particular year.

**IV.     THE HIGH-PRESSURE SALES PROCESS**

67.     The one-on-one, high pressure sales experience is a cornerstone of DRI's business model.  DRI has 61 sales centers around the world, with a full in-house sales and marketing team at 49 of these locations, including their Polo Towers hotel property in Las Vegas, Nevada.  A

---

[5] Roddy Boyd, *Diamond Resorts and Its Perpetual Mortgage Machine*, Southern Investigative Reporting Foundation, March 7, 2016 (available at http://sirf-online.org/2016/03/07/27464/).

substantial portion of DRI's sale of exchange pool "points" in the U.S. Collection take place at the sales office in Las Vegas, though these "points" are sold at various locations throughout the United States.

68.     The DRI sales technique, however, is not unique to any particular office.  The same high pressure sales pitch is utilized by virtually all DRI salespeople at offices throughout the country.  Indeed, DRI touted the uniformity of its sales practice in its most recent (and last) 10-k filing with the SEC, stating:

> Our sales force is highly trained in a consultative sales approach designed to ensure that we meet customers' needs on an individual basis.  We manage our sales representatives' consistency of presentation and professionalism using a variety of sales tools and technology.  The sales representatives are principally compensated on a variable basis determined by performance, subject to a base compensation amount.[6]

69.     In order to generate sales, DRI relies on high-pressure, in-person sale pitches, which take place following presentations at resorts targeted to prospective investors as well as current investors and their guests, and through "mini-vacation" packages. In these packages, a sales target is offered a free "experience" – for example, a dinner at a high-end restaurant, tickets to a Cirque de Soliel performance in Las Vegas, tickets to a popular sporting event, or even an entire trip to Las Vegas for a period of several days – for "free," *if* they attend and sit through the entirety of a sales presentation that is said to last 90 minutes but often lasts as long as five or six hours or more. If the target fails to attend the sales presentation, or leaves before the presentation has completed, the individual is told that he or she is responsible for paying the cost of the entire "free" experience.

A.     **DRI Salespeople State the Points Will Increase in Value**

70.     First, the DRI salesperson reiterates that points in THE Club/the Association exchange pool will increase in value, because the value of the underlying real estate properties increases, due largely to DRI's efforts to maintain, upkeep and improve the properties, as well as

---

[6] *See* DRI 10-k at 14.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

the general appreciation of real estate. In effect, the DRI salesperson represents that because DRI is always working to improve the quality of the resorts, and because real property values in general are increasing, the value of the target's investment in THE Club/the Association will increase as well.

71.     Further, the prospective investors are routinely told that the points they are purchasing are being sold to them at a discount from their regular price, so that they will immediately have "equity" because they own interests that are worth more than the purchase price.

72.     Indeed, during sales presentations, DRI salespersons routinely provide potential investor-members with a one-page document titled "Pricing History and Location Growth for Diamond Resorts International," or similar document (which is sometimes shown on a computer or described orally), which purports to set forth how the DRI points have increased and will increase in value over time. A recent version of this document states that between January 26, 2013 and January 1, 2017 DRI points in the U.S. Collection had a "15 price per point increase in less than three years" with an "average" increase of 25%. The document notes that a DRI has add several locations between 2007 and 2016. Finally, the document states that points purchased "today" at a price of $8.61 per point will be "worth" $10.76 per point in one year, and $13.45 in two years.

73.     However, as set forth above, the points have no intrinsic value. They are not tied to any ownership interest in any piece of real estate, because the real estate interest is held in trust for the Association. Moreover, the offer to sell points at a discount as being time sensitive is false. Prospective purchasers are not receiving any preferential treatment or receiving any special, discounted price on the day of the sales presentation. The price point offer will be available to the purchaser on the following day and the following week.

74.     Because THE Club can increase the number of points in the pool as much as it would like, and because THE Club can arbitrarily change the "value" of a point at any time, it is virtually impossible to determine what the value of any member's points is, and thus impossible to determine whether the points' value has increased over time. Moreover, the points have no

market value because they generally cannot be sold due to the restrictions that DRI has placed on them. In effect, DRI points are illiquid and worthless to the purchaser because DRI effectively has a monopoly on the sale of points.

75.    DRI salespeople also tell existing investor-members that they will "save money" on maintenance fees for their existing points by purchasing more points.  Sales people represent that, by purchasing additional points, an investor will enter a different "tier" of membership and will thereby be able to apply points as payment of paying maintenance fees (or pay fewer maintenance fees).  Such representations are false, because the fees are calculated based on how many points a member owns – the more points, the more fees.

**B.    DRI Salespeople State that there is a Market for Points, and DRI will Help Investor-Members Find Buyers for Their Points**

76.    Of course, an investment's appreciation in value requires the existence of a market for the investment.  DRI salespeople mislead potential investor-members into believing that there is a robust market for the sale of points in THE Club/Association exchange pool, and they will be able to easily sell their points after they have increased in value (which they purportedly already have because they were purchased at a "discount"), thereby capturing a significant return on their investment.  DRI salespeople further represent that they, and/or DRI, will assist the investor-buyer in locating a buyer to purchase the DRI member's points.

77.    In reality, however, this statement is belied by THE Club's Legal Documents (which potential investor-members are not provided any meaningful opportunity to study and review before agreeing to purchase their points).  Points in THE Club are non-transferrable; indeed "membership in THE Club shall be personal to the Member and may not be voluntarily or involuntarily assigned or conveyed regardless of whether the purported assignment or conveyance is to the successor in interest to such Member's Qualifying Interest."[7]

---

[7] *See* THE Club Legal Documents, 2015-2016, Art. 3.5.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

78.     While an investor-member's membership in the Association could, theoretically, be sold – conditioned on DRI's consent, which it is entitled to withhold in its discretion and which it virtually never grants – there is no viable market for these membership interests. First, no fully-informed rational buyer would purchase points on the resale market, if a viable market even existed. The buyer must be willing to assume the onerous fees described herein. A reasonable, fully-informed potential buyer would prefer to simply reserve rooms at the resort in question without purchasing any points or interest in the Association. By way of example, DRI directly markets and rents rooms to the general public at its various resorts. Non-DRI members may book rooms by the night without having to expend enormous upfront sums on points or being charged maintenance fees. Second, DRI restricts the prospective resale of points that are not purchased directly from DRI.     Further, the DRI salesperson's representation that they will help an investor/member sell their points directly contradicts THE Club "Legal Documents," which state that "THE Club Operating Company has no obligation to assist a Member with the resale, lease or rental of his or her Qualifying Interest."

79.     Indeed, so many DRI investor-members (as well as purchasers of interests of various timeshare companies) are desperate to release themselves from their continuing obligation to make high-interest financing payments and exorbitant maintenance fees that an entire industry has arisen to help them do so. Called "timeshare exit companies", these organizations will – for a fee that typically ranges in the many thousands of dollars to the tens of thousands of dollars – attempt to find a buyer for points or time share interests (or otherwise help the purchaser try to get out of his or her contract). People generally utilize these timeshare exit companies services only as a last resort, after all prior efforts to rid themselves of their investment have failed. Simply put, once the brief period to rescind the membership has expired, there is no way for an investor-member to get out of his or her contract. Investor-members are trapped in perpetuity because there is no viable secondary market for the resale of points and memberships. Moreover, DRI even prohibits the use of points to rent rooms except to friends and relatives. Accordingly, the timeshare exit companies typically try to negotiate a release from the timeshare membership. Success rates

are extremely low because DRI has no interest in letting investor members out of their contracts. In the overwhelming majority of cases, the timeshare exit companies advise investor-members to simply stop making payments on their maintenance fees and/or loan. When that happens, DRI terminates the membership, recaptures the points and then resells them to new purchasers. The net result is that the purchasers lose their entire investments. Furthermore, DRI reports the purchasers to the credit agencies thereby damaging the purchasers' credit scores.

80. Although DRI salespeople regularly represent to member investors that there exists a viable secondary market for points, DRI not only refuses to help its member-investors sell their points, it targets and attacks timeshare exit companies and law firms who attempt to help investor-members (sometimes by suing them) in an attempt to effectively destroy any possible secondary market. DRI has experienced a substantial increase in the number of purchasers who are defaulting on their loans and maintenance fees.

81. DRI has a significant interest in ensuring that no viable secondary market exists for its points (despite its representations to the contrary during its sale pitches). Pursuant to the Purchase and Security Agreement, DRI can, and does, "recover" (*i.e.*, repossess) member-investors' points if the member-investor defaults on any payment due to DRI, including any payments due under a loan financed by DRI, maintenance fees, or any other obligation that the member-investor owes to DRI. Thus, if a member-investor is unable to continue making payments to DRI and defaults under the terms of the Purchase and Security Agreement or credit sales contract, DRI can repossess their points and resell them to another member-investor or new purchaser, meaning that DRI has little to lose – and much to gain – if a member-investor defaults. In fact, the DRI 10-k states that when DRI member-investors default of their payments, those interests "are added to [DRI's] existing inventory and resold at full retail value" and such "recovered" points "may be sold by [DRI] in the form of points to new customers or existing members."[8] If, however, that same member-investor could utilize a secondary market to sell their

[8] DRI 10-k at 21.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1   points, they would, presumably, do so – thereby costing DRI the opportunity to profit off of the

2   resale. Thus, DRI has a significant pecuniary interest in ensuring that no viable secondary market

3   for its points is ever established.

### C.   DRI Salespeople Represent That Investor-Members Can Bequeath Their Points to Heirs to Convince Their Potential Sales Targets That the Points are a Sound Investment

82.     In the course of their sales pitch to potential investor-members, DRI salespeople

emphasize the fact that they can leave the points to their children, grandchildren, or other heirs in

a will. This tactic is designed to encourage the potential investor-member to view the points as a

long-term investment; something they can enjoy and then pass down to their children; and

something that will increase in value, act as a hedge against inflation and can one day be sold for

a significant profit.

83.     Unfortunately, while THE Club does provide that it will "ordinarily" and at its

discretion approve the transfer of points to an immediate family member following an investor-

member's death, points in THE Club are not an inheritance any rational person would want. As

set forth above, the points are not tied to an interest in real property, they have no intrinsic value,

and, indeed, they largely serve to saddle their owner with massive annual fees and loan payments.

In leaving their points to their heirs, investor-members are not providing for their future, but rather,

they are burdening them with debt.

### D.   The DRI Sales Motto – "No Heat, No Eat"

84.     The DRI sales pitch itself is designed to exhaust and bewilder a potential investor-

member until they "give in" and purchase points. The DRI sales person takes the individual (or

couple) to a small office or other area. They are not permitted to leave the room or area to review

any written material they are provided – they must first agree to purchase their points on the spot.

They cannot consult with an attorney, a financial advisor, one of their adult children, or any other

person not in the sales pitch location.

85.     Many of DRI's targets are senior citizens, many of whom are living on a fixed

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

income. It makes no fiscal sense for these targets (or anyone who succumbs to the sales pitch) to purchase – often via financing at credit card interest rates – hundreds of thousands of dollars of "points" just to go on vacations a few times per year. Instead, Plaintiffs and the Class purchased points because DRI sold them as an investment.

86.     DRI salespeople are highly incentivized to sell points to investors by any means necessary. DRI salespeople are principally compensated based on a "performance basis," meaning that their income is directly correlated to how many points they sell.

87.     Upon information and belief, a motto within the DRI sales department is "no heat, no eat." "Heat" refers to the high-pressure sales tactics utilized by DRI sales people to induce targets to purchase points; "eat" refers to the salesperson's ability to earn money to buy food and other things.

## V.     THE TERMS OF THE DRI PURCHASE AND SECURITY AGREEMENTS

### A.     The Member-Investor's Right to Rescind the Agreements is Illusory

88.     At least some of the DRI Purchase and Security Agreements and credit sales contracts by which DRI sells points in the U.S. Collection and Hawaii Collection contain a rescission provision which provides that the purchaser has 5 to 10 days after signing the contract to rescind its terms.

89.     This right to rescind is illusory, however. First, as set forth above, investor-members sign DRI contracts following multi-hour long, high pressure sales presentations during which they are given no meaningful opportunity to review the terms of the Purchase Agreement prior to signing. Moreover, the vast majority of DRI's investor-members are on vacation when they attend a sales presentation and then sign the Agreement, meaning that they generally do not review the terms of the contract until they have returned home – which, in many cases, means they are not even aware of their right to rescind until the deadline by which to do so has already passed.

90.     Additionally, the Agreement is constructed with densely-worded, highly technical language in small print with scant headings and little organization. It is virtually impossible for a layperson to fully comprehend its provisions. Finally, the purchaser is required to review, sign

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1   and initial numerous other documents that would take many hours to read and understand. Simply

2   put, the closing is designed to rush the purchasers through the process so that they are not afforded

3   a fair opportunity to understand what they are buying or what obligations they are undertaking.

4        91.    Further, because the Purchase and Security Agreements and other documents

5   provided to investor-members after they sign the Agreements do not clearly describe the points as

6   a security, nor do the contracts adequately provide accurate and complete information regarding

7   the investor-member's rights under the law nor any of the information required to be set forth in a

8   prospectus for the offering of a security (which in and of itself renders the Agreement void and

9   unenforceable),[9] it is impossible for an investor-member to understand what, precisely, he or she

10  has purchased without the assistance of an attorney and/or financial advisor.  Because investor-

11  members are prohibited from having an attorney, financial advisor, or anyone else review the sales

12  materials including the PSA or the Credit Sales Contract before they sign it, and because most

13  investor-members sign their Agreements while on vacation and thus would not be able to provide

14  the document to their attorney or financial advisor for several days, any right to rescind in 5 to 10

15  days is purely illusory.

16  **B.    The Arbitration Clause Does Not Apply**

17

18       92.    The DRI PSAs and Credit Sales Contracts that the purchasers sign contain a clause

19  mandating that any dispute arising under the terms of the Agreement must be arbitrated. These

20  arbitration clauses are inapplicable and unenforceable because the Agreement represents an

21  attempt to sell an unregistered security.  As such, the entire Agreement – including the arbitration

22  clause – is void and unenforceable under federal securities law.[10]

23       93.    Moreover, the SEC policy and practice is that an issuer of securities may not include

24  a mandatory arbitration provision in its bylaws or attempt to preclude class action (or other)

25

26

---

27  [9] *See* 17 C.F.R. 229.500 *et seq.*; 17 C.F.R. 239.11; S.E.C. Form S-1.

28  [10] *See* 15 U.S.C. § 77n; *see also* 15 U.S.C. § 78cc.

1    lawsuits by shareholders.[11].

2    **V.    The Plaintiffs Are Induced to Invest in the Association/THE Club to Their Great**
3    **Detriment**

4        **A.    The Dropp Plaintiffs**

5        94.    The Dropp Plaintiffs, like many other members of the Class, were initially owners

6    of an unrelated timeshare company that was purchased by DRI.  Over the course of approximately

7    15 years, the Dropp Plaintiffs acquired a timeshare interest in four properties located in Virginia

8    Beach, Virginia and Kill Devil, North Carolina, through the Gold Key Resorts ("Gold Key").

9    Under the terms of this timeshare agreement, the Dropp Plaintiffs owned the right to use these

10   properties for certain weeks each year.

11       95.    On or about August 18, 2015, DRI announced that it had purchased Gold Key's

12   timeshare business.

13       96.    The following year, on August 4, 2016, the Dropp Plaintiffs attended an annual

14   sales presentation (described by DRI as an "update meeting") that DRI indicated was mandatory

15   for all Gold Key timeshare owners. At that meeting, DRI told the Dropp Plaintiffs that failure to

16   purchase DRI points would render the Dropp Plaintiffs' existing timeshare membership useless or

17   worthless.

18       97.    Following the sales presentation, the Dropp Plaintiffs purchased a membership in a

19   U.S. Collection Association "worth" 8,500 points for a total cost of $25,000.  In order to pay this

20   amount, the Dropp Plaintiffs were induced to apply for, and received, a Barclaycard Diamond

21   Resort credit card, and placed half of the cost of the points on the Diamond Resort card in order to

22   finance their purchase.

23       98.    Only a few hours after the Dropp Plaintiffs purchased their 8,500 points, they

24   received a phone call from a DRI representative insisting that they were required to schedule an

25

26   ───────────────

27   [11] *See,* Karan Singh Tyag, *Carlyle Leaves Out Mandatory Arbitration Clause in IPO,* Kluwer Arbitration
     Blog (Feb. 7, 2012), *available at* http://arbitrationblog.kluwerarbitration.com/2012/02/07/carlyle-leaves-
28   out-mandatory-arbitration-clause-in-ipo/.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

"orientation meeting" with DRI that would take place in Las Vegas. Plaintiffs were required to pay for airfare and put down a $300 deposit, and the rest of the three-day trip to Las Vegas would be "free." However, if Plaintiffs failed to attend the sales meeting in Las Vegas on the third day of the trip, they would be charged for the entire cost of the trip. Plaintiffs arranged to take the trip and attend the "orientation meeting."

99.   Plaintiffs attended the sales presentation in Las Vegas on November 9, 2016. Plaintiffs were approached by a DRI salesperson. The salesperson took Plaintiffs to a private office and made, *inter alia*, the following representations to them:

- He described DRI points as an "investment."

- He stated that the Dropp Plaintiffs would own an interest in real property by purchasing DRI points.

- He said that these additional points in DRI, plus the 8,500 points already owned by the Dropp Plaintiffs, would be worth approximately $700,000. He indicated that they would have $700,000 of "equity."

- He stated that the value of the points would increase over time due to the improvements and updates that DRI continuously made to their properties.

- He indicated that the points (and the "properties") should be added to the Dropp Plaintiffs' wills and could be bequeathed to their children and grandchildren.

- He stated that the points could be sold for a profit in the future.

- He informed the Dropp Plaintiffs that they could use their Diamond credit card for purchases and earn (wholly separate) points, which could be applied to their maintenance fees.

100.   Relying on these representations that the points were a sound investment, the Dropp Plaintiffs then purchased a membership in a U.S. Collection Association "worth" 50,000 points for a total price of $140,000.

101.   Of the $140,000 sale price for the points, the Dropp Plaintiffs made a down payment of $15,000 and financed the rest through DRI.

102.   In addition to making payments every month towards the cost of the points, the

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Dropp Plaintiffs are responsible for annual maintenance fees of approximately $15,000 per year as of January 2018.  Contrary to the DRI salesperson's representations, in no way do purchases made on the Diamond credit card offset or absolve the Dropp Plaintiffs of their obligation to pay their annual maintenance fees.

**B.**    **The Levine Plaintiffs**

103.    Plaintiff Susan Levine first purchased DRI points in the U.S. Collection in or around 2007.  By 2016, she had acquired approximately 35,000 DRI points in the U.S. Collection.

104.    In October 2016, the Levine Plaintiffs travelled to Hawaii on vacation.  While there, they attended a DRI sales presentation on October 25, 2016 at the DRI sales office at the Royal Kona Resort in Kona, Hawaii.  During the course of this sales presentation, a DRI sales person represented to the Levine Plaintiffs that:

- They should convert all of Susan Levine's points in the U.S. Collection to points in the Hawaii Collection, because points in the Hawaii Collection would appreciate faster than points in the U.S. collection due to the fact that there is limited real estate in Hawaii, causing real estate values to continue to rise.

- Their points could be passed down to their heirs and could be sold by their heirs at a profit.

- However, in order to convert Susan's points in the U.S. Collection to points in the Hawaii Collection, they would have to purchase additional points in the Hawaii Collection.

- If they purchased points in the Hawaii Collection immediately, they would purchase at a "low price" because the prices per point were steadily increasing.

105.    Relying on the DRI salesperson's representations that the points in the Hawaii Collection were a sound investment, on October 25, 2016 the Levine Plaintiffs converted Susan Levine's 35,000 points in the U.S. Collection to points in the Hawaii Collection.  They also purchased a membership in the Hawaii Collection "worth" 30,000 points for a price of $84,650.

106.    In May 2017, the Levine Plaintiffs traveled to Miami on vacation.  While there, on May 11, 2017, they attended another DRI sales presentation at the Diamond Crescent Resort in Miami, Florida.  During the course of that sales presentation, a DRI salesperson represented to

them that:

- Points in the U.S. Collection are actually more valuable than points in the Hawaii Collection because the U.S. Collection requires the payment of lower maintenance fees than the Hawaii Collection.

- Points purchased in the U.S. Collection are steadily increasing in value and could be sold at a profit in the future.

- However, in order to convert their points in the Hawaii Collection to points in the U.S. Collection, they would need to purchase additional points in the U.S. Collection.

107.    In reliance on the DRI salesperson's representations that the points in the U.S. Collection were a sound investment, on May 11, 2017 the Levine Plaintiffs converted their points in the Hawaii Collection to points in the U.S. Collection, and purchased a membership in the U.S. Collection "worth" 25,000 points for a price of $71,250.

108.    In July 2017, the Levine Plaintiffs traveled to Las Vegas, Nevada.  While there, on July 11, 2017, they attended another DRI sales presentation at the DRI sales office in the Polo Towers in Las Vegas.  During the course of the sales presentation, a DRI salesperson represented to them that:

- DRI was implementing a new "Legacy Program" designed to operate as an estate planning device beginning in January 2018.  Through the Legacy Program, DRI itself would sell up to 20,000 of the Levine Plaintiffs' points at a price of $8.79 per point, generating a total sale price of $176,000, minus an estimated escrow fee.  The profit would be passed along to the Levine Plaintiffs, and they would not have to do anything other than to contact DRI to commence the selling of the points.  However, in order to participate in the Legacy Program, the Levine Plaintiffs would have to purchase 50,000 additional points in the U.S. Collection.

- Further, if the Levine Plaintiffs or their heirs wished to sell all of their points in the future, Diamond would "handle" the sale and sell the points at a price of $8.79 per points for a total amount of $1,230,000 minus closing costs.  This was presented as an estate planning device.

- Additionally, if the Levine Plaintiffs purchased 50,000 additional points in the U.S. Collection that day, they could convert up to 80,000 of the DRI points to a credit on their Diamond International credit card and could use that credit to pay their annual maintenance fees.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

- Again, the Levine Plaintiffs were told that prices per point in the U.S. Collection were constantly increasing and they had to purchase points that day in order to reap the benefits of this investment.

109.    In reliance upon the representations of the DRI salesperson, on July 11, 2017, the Levine Plaintiffs purchased an additional membership in the U.S. Collection "worth" 50,000 points for a total cost of $144,000.

110.    In January 2018, the Levine Plaintiffs contacted DRI to request that DRI begin selling some of their points pursuant to the Legacy Program.   To their shock, the DRI representative informed the Levine Plaintiffs that no such program existed, and that DRI would not make any attempts to sell their points.

111.    In addition to making payments every month towards the cost of the points, the Levine Plaintiffs are responsible for annual maintenance fees of approximately $24,000 per year as of January 2018.  Contrary to the DRI salesperson's representations, no program exists by which the Levine Plaintiffs can convert some of their points to a credit card credit and use that credit to pay their onerous maintenance fees.

## C.    Plaintiff Pakka

112.    Like many other class members, Plaintiff Pakka's first interaction with DRI occurred when DRI acquired a traditional timeshare company from which she had purchased timeshare interests, in her case, Sunterra Corporation, in March 2007.   Plaintiff Pakka had purchased a timeshare interest with Sunterra in February 2007.

113.    After DRI acquired Sunterra Corporation in March 2007, Plaintiff Pakka's timeshare interest in Sunterra was "converted" to 30,000 points in the DRI U.S. Collection.

114.    In November 2016, Plaintiff Pakka travelled to Hawaii on vacation.   While there, she attended a DRI sales presentation on November 16, 2016 at the DRI sales office in Maui, Hawaii.  During the sales pitch, a DRI salesperson represented to Plaintiff Pakka that:

- The DRI points were an "investment" that would increase in value over time. Indeed, the salesperson provided Plaintiff Pakka with the "Pricing History and Location Growth for Diamond Resorts International" document which, as described above, projects how much value the

points will gain over time.

- The value of her points "can only go up."

- She would have "no problem" selling her points.

- In addition to making payments every month towards the cost of the point, she will be responsible for annual maintenance fees of approximately $15,000 per year as of January 2018.

115.    Relying on the representations of the DRI salesperson and the documents the salesperson provided to her during the pitch, on November 16, 2016 Plaintiff Pakka purchased a membership in the U.S. Collection Association "worth" 50,000 points for a total price of $175,356, plus $825 in closing costs.

## STATUTE OF REPOSE ALLEGATIONS

116.    Section 13 of the Securities Act of 1933 provides that all claims under the Securities Act must be brought within one year of the discovery of the violation and within three years after the security was offered to the public.[12]

117.    As described herein, the typical investor would not be able to discover facts sufficient to form the basis for an investigation into the question of whether that the sale of "points" was actually the sale of an unregistered security. Moreover, investors in such points are not put on inquiry notice of the fact that the purchase of such points constitutes the purchase of securities under applicable law. For the reasons alleged herein, Diamond's sales practices and ongoing business practices are designed to prevent such inquiry notice. Reasonable inquiry into this matter is possible only after a thorough investigation and analysis by attorneys or financial professionals with highly specialized knowledge of the provisions of the Securities Act who make sustained efforts to obtain access to a substantial body of information concerning Diamond's sales practices involving numerous investors and salespersons over a period of time in several Diamond sales center locations. Upon information and belief, almost none of the Class members are aware that they have purchased an unregistered security under the Act.

---

[12] *See* 15 U.S.C. § 77m.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

118. Thus, the full three-year statute of repose, and not the one-year-from-discovery statute of limitations, should apply to the claims set forth herein.

## CLASS ACTION ALLEGATIONS

119. Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action individually and on behalf of the following class of similarly situated persons:

> All persons who purchased "points" in THE Club and membership in a Diamond Resorts U.S. Collection Members Association or in the Diamond Resorts Hawaii Collection Members Association on or after three years prior to date of filing of this complaint. Excluded from the Class are Defendants and any of their affiliates, current and former employees, officers, and directors.

### A.    Numerosity – Fed. R. Civ. P. 23(a)(1)

120. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Thousands of individuals have collectively purchased hundreds of millions of points in the U.S. Collection. Indeed, according to DRI's last and most recent 10-k filing with the S.E.C., as of December 31, 2015, the DRI loan portfolio (representing loans taken out by investor-members in order to finance their purchase of membership/points) totaled approximately 64,000 loans with an outstanding aggregate loan balance of $916.1 million.[13] Additionally, DRI reported that it earned $765 million in revenue from its "vacation interest sales and financing" segment in 2015.[14]

### B.    Commonality and Predominance – Fed. R. Civ. P. 23(a)(2) and 23(b)(3)

121. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because it involves common questions of law and fact, and because these common questions predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation, the following:

   a.   Whether the points in a U.S. Collection Members Association, the Hawaii Collection and/or THE Club constitute securities under the

---

[13] *See* DRI 10-k, Dec. 31, 2015, at 15.

[14] *See id.* at 6.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Securities Act;

b. Whether DRI violated the registration provisions of the Securities Act;

c. Whether a common practice of DRI employees and/or agents to potential investors was to make representations that "points" are investments that will appreciate in value due to the efforts of DRI as set forth herein; and

d. The nature of relief that may be granted to Plaintiffs and the Class under the Securities Act.

**C.     Typicality – Fed. R. Civ. P. 23(a)(3)**

122.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by Defendants.  The relief Plaintiffs seek is typical of the relief sought for the absent Class members and does not conflict with the interests of any other members of the Classes.

**D.     Adequate Representation – Fed. R. Civ. P. 23(a)(4)**

123.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting securities class action litigation to represents themselves and the Class.

124.    Plaintiffs and their counsel are committed to vigorously prosecuting this action and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

**E.     Superiority – Fed. R. Civ. P. 23(b)(2) and 23(b)(3)**

125.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to the Class as a whole.

126.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1   controversy.

2   127.   Because the damages suffered by and/or the relief that may be afforded to each

3   individual Class member are relatively small in comparison to the expense of litigation, the

4   expense and burden of individual litigation would make it very difficult or impossible for

5   individual Class members to redress the wrongs done to each of them individually, such that most

6   or all Class members would have no rational economic interest in individually controlling the

7   prosecution of specific actions, and the burden imposed on the judicial system by individual

8   litigation by even a small fraction of the Classes would be enormous, making class adjudication

9   the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

10   128.   The conduct of this action as a class action presents far fewer management

11   difficulties, far better conserves judicial resources and the parties' resources, and far more

12   effectively protects the rights of each Class member than would piecemeal litigation.  Compared

13   to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of

14   individualized litigation, the challenges of managing this action as a class action are substantially

15   outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of

16   class treatment in this Court, making class adjudication superior to other alternatives, under Fed.

17   R. Civ. P. 23(b)(3)(D).

18

19   129.   Plaintiffs are not aware of any obstacles likely to be encountered in the management

20   of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court

21   with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and

22   reduce management challenges.

23                                    **CLAIMS FOR RELIEF**

24                                           **COUNT I**

25   **(Unregistered Offer and Sale of Securities in Violation of Section 5(a), 5(c),**
     **and 12(a)(1) of the Securities Act – Against All Defendants)**
26

27   130.   Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

28   131.   Section 5(a) of the Securities Act of 1933 prohibits the use of "any means or

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

instruments of interstate commerce or of the mails" in the sale of a security "unless a registration is in effect" as to that security. *See* 15 U.S.C. § 77e(a).

132.    Section 5(c) of the Securities Act of 1933 provides that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security." *See*15 U.S.C. § 77e(c).

133.    Section 12(a)(1) of the Securities Act of 1933 provides that "Any person who offers or sells a security in violation of section 5...shall be liable...to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, or for damages if he no longer owns the security." *See* 15 U.S.C. § 77*l*(a)(1).

134.    Registration of a security with the SEC is not a perfunctory or rote process.  To the contrary, SEC. regulations mandate that any issuer of a security file a prospectus which in turn must provide extensive, detailed information regarding, *inter alia*, risk factors, ration of earnings to fixed charges, use of proceeds, determination of offering price, plan of distribution, and any potential conflicts of interest of the named experts and counsel. *See, e.g.*, 17 C.F.R. 229.500 *et seq.* 17 C.F.R. 239.11, S.E.C. Form S-1.  This prospectus must be reviewed by the SEC to determine full compliance with all applicable regulations.  Any comments to the preliminary prospectus must be addressed to the SEC's satisfaction before the issuer may offer the applicable security for sale.

135.    Defendants made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

136.    Defendants sold "points" in various "membership associations" exchange pools including the Diamond Resorts U.S. Collection Associations and the Hawaii Collection Association, which are in turn affiliated with points in THE Club.  These points are affiliated with

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

the ability to reserve rooms at various hotels and resorts for various lengths of time. The "points" system is modelled after a traditional timeshare system, but is different in several key respects.

137.    Defendants, through their sales people, represented to Class members, including Plaintiffs, that these "points" reflected an ownership interest in real property and were an investment. Defendants further represented that the value of the points would increase over time and Plaintiffs and other Class members would be able to sell their points at a profit. Defendants represented that the value increase would be due, at least in part, to the efforts of Defendants insofar as they manage and market the various hotels, resorts, and other properties.

138.    The "points" were marketed as securities.

139.    Defendants utilized the mails, and interstate commerce and communication, including interstate telephone calls and internet communication, to market and sell these securities.

140.    No registration statements have been filed with the SEC or have been in effect with respect to the offering of the "points."

141.    By reason of the foregoing, the Defendants have violated Sections 5(a), 5(c) and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), & 77*l*(a)(1).

142.    As a direct and proximate result of the Defendant's sale of unregistered securities, Plaintiffs and members of the class have suffered damages in connection with the respective purchases of "points" in the U.S. Collection and the Hawaii Collection.

## COUNT II

**(Control Person Liability Pursuant to Section 15(a) of the Securities Act – Against the Individual Defendants and Apollo)**

143.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

144.    Section 15(a) of the Securities Act provides that "[e]very person who, by or through stock ownership, agency, or otherwise…controls any person liable under section 11 or 12 [of the Securities Act], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable…" *See* 15 U.S.C. § 77o(a).

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

145.    As the Chief Executive Officer, Defendant Flaskey is the head of DRI, and thus considered a "control person" of DRI.

146.    As the President and Chief Administrative Officer of DRI, Defendant Siegel is a "control person" of DRI.

147.    The Individual Defendants were both officers and controlling persons of Defendants charged with the legal responsibility of overseeing its operations.  Both controlling persons had the power to influence and exercised the same to cause Defendants to engage in the unlawful acts and conduct complained of herein.

148.    As the owner of DRI, Apollo was a control person of Defendants charged with the legal responsibility of overseeing its operations.  Both controlling persons had the power to influence and exercised the same to cause Defendants to engage in the unlawful acts and conduct complained of herein.

149.    By reason of such conduct, the Individual Defendants and Apollo are liable pursuant to Section 15(a) of the Securities Act.  As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of DRI "points."

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Fed. R. Civ. P. 23;

B.    Determining that the unlawful conduct alleged above is in violation of Sections 5(a), 5(c), 12(a)(1), and 15(a) of the Securities Act;

C.    Injunctive relief prohibiting Defendants from continuing to market and sell unregistered securities in violation of Sections 5(a), 5(c), 12(a)(1), and 15(a) of the Securities Act;

D.    Granting Plaintiffs and other Class members to right to rescind their purchases of points/memberships as set forth herein.

E.    Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

F.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

G.    Such other relief as deemed appropriate by the Court.

### JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff and the class hereby demand a trial by jury of all issues so triable.

DATED this _9th_ day of February, 2018.

ALBRIGHT, STODDARD, WARNICK
& ALBRIGHT

G. MARK ALBRIGHT (Nv #001394)
D. CHRIS ALBRIGHT, ESQ. (Nv #004904)
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada 89106
Tel:  (702) 384-7111
Fax:  (702) 384-0605
gma@albrightstoddard.com
dca@albrightstoddard.com

WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
LAWRENCE P. KOLKER
LYDIA KEANEY REYNOLDS
270 Madison Avenue
New York, NY 10016
Tel:  (212) 545-4600 / Fax:  (212) 545-4653
Kolker@whafh.com
Reynolds@whafh.com
*Attorneys for Plaintiffs*

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

## PLAINTIFFS' CERTIFICATION

Joseph Dropp and Mary Dropp ("Plaintiffs") declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiffs have reviewed the accompanying Complaint and authorized the filing of the Complaint on Plaintiffs' behalf.

2.    Plaintiffs did not purchase the securities that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in this private action.

3.    Plaintiffs are willing to serve as representative parties on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiffs' transaction in **Diamond Resorts International, Inc.** securities during the Class Period specified in the Complaint are as follows:

| Date | Number of Points Purchased | Amount Paid for Points |
|------|----------------------------|------------------------|
| August 4, 2016 | 8,500 | $25,000 |
| November 9, 2016 | 50,000 | $140,000 |

5.    During the three years prior to the date of this Certificate, Plaintiffs have not sought to serve or served as representative parties for a class in action filed under the federal securities law.

6.    Plaintiffs will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiffs' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25

day of January, 2018.

_____
Joseph Dropp

_____
Mary Dropp

2

## PLAINTIFFS' CERTIFICATION

Susan Levine and Robert Levine ("Plaintiffs") declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiffs have reviewed the accompanying Complaint and authorized the filing of the Complaint on Plaintiffs' behalf.

2.    Plaintiffs did not purchase the securities that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in this private action.

3.    Plaintiffs are willing to serve as representative parties on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiffs' transaction in **Diamond Resorts International, Inc.** securities during the Class Period specified in the Complaint are as follows:

| Date | Number of Points Purchased | Amount Paid for Points |
|---|---|---|
| October 25, 2016 | 30,000 | $84,650 |
| May 11, 2017 | 25,000 | $71,250 |
| July 11, 2017 | 50,000 | $144,000 |

5.    During the three years prior to the date of this Certificate, Plaintiffs have not sought to serve or served as representative parties for a class action filed under the federal securities law.

6.    Plaintiffs will not accept any payment for serving as representative parties on behalf of the class beyond the Plaintiffs' pro rata share of any recovery, except such reasonable

costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9 day of February, 2018.

_____
Susan Levine

_____
Robert Levine

## CERTIFICATION OF PLAINTIFF

KAARINA PAAKA ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the accompanying Complaint and authorized the filing of the Complaint on Plaintiff's behalf.

2.      Plaintiff did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transaction in **Diamond Resorts International, Inc.** securities during the Class Period specified in the Complaint are as follows:

| Date | Number of Points Purchased | Amount Paid for Points |
|---|---|---|
| November 16, 2016 | 50,000 | $175,356 |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in action filed under the federal securities law.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 9th day of February, 2018.

/s/ Kaarina Pakka
KAARINA PAKKA