G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 001394
D. CHRIS ALBRIGHT, ESQ.
Nevada Bar No. 4904
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada 89106
Tel: 702.384.7111
Fax: 702.384.0605
gma@albrightstoddard.com
dca@albrightstoddard.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| JOSEPH M. DROPP, MARY E. DROPP, ROBERT LEVINE, SUSAN LEVINE, and KAARINA PAKKA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> DIAMOND RESORTS INTERNATIONAL, INC. *et al*, <br><br> Defendants. | CASE  NO.:  2:18-cv-00247-RFB-GWF |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION, MOTIONS TO DISMISS, MOTIONS TO STRIKE CLASS ALLEGATIONS, AND MOTION TO SEVER PLAINTIFF PAKKA'S CLAIMS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………………1

STATEMENT OF FACTS ........................................................................2

ARGUMENT ............................................................................6

I.   DEFENDANTS' MOTIONS TO COMPEL ARBITRATION
     AND DISMISS PLAINTIFFS' CLAIMS SHOULD BE DENIED ...............6

     A.   The Arbitration Provisions Are Unenforceable Because
          the Entire Sales Agreements Constitute  Sales of
          Unregistered Securites and Are thus Void under State and
          Federal Law.............................................................6

     B.   The Arbitration Provisions are Unenforceable, And Their
          Applicability Cannot Be Determined by an Arbitrator,
          Because Their Application Would Preclude Plaintiffs
          from Exercising Their Statutory Rights................................8

     C.   Arbitration Agreements Are Not Permitted in
          Registration Statements and Thus are Void in the Purchase
          Agreements...........................................................11

     D.   The Arbitration Agreements are Unenforceable
          Because They Are Procedurally and Substantively
          Unconscionable .....................................................12

          1.   The Arbitration Provisions Are Procedurally
               Unconscionable...............................................13

          2.   The Arbitration Provisions Are Substantively
               Unconscionable...............................................14

     E.   Even if Enforceable, the Arbitration Provisions do not
          Apply to the Apollo Defendants .....................................15

II.  DEFENDANTS' MOTIONS TO STRIKE PLAINTIFFS' CLASS
     ALLEGATIONS SHOULD BE DENIED ...................................17

III. DEFENDANTS' MOTIONS TO DISMISS THE DROPP |AND LEVINE
     PLAINTIFFS' CLAIMS SHOULD BE DENIED ...........................19

IV.  THE DIAMOND DEFENDANTS' MOTION TO SEVER
     PLAINTIFF PAKKA'S CLAIMS AND TRANSER VENUE
     SHOULD BE DENIED ...............................................20

i

A.   The Forum Selection Clause is Unconscionable and
     Unenforceable Because it Requires Individual Investor-
     Members to Litigate Their Claims in a Far-Flung Jurisdiction ..........20

B.   It is Not in the Public Interest to Transfer Plaintiff Pakka's
     Claims......................................................................................................22

     1.   The District of Hawaii Has No Local Interest in this
          Action...........................................................................................22

     2.   The District of Hawaii Has No Special Familiarity
          with the Federal Securities Law at Issue in this Action ...........23

     3.   None of the Other Public Interest Factors Weigh
          in Favor of Transferring Plaintiff Pakka's Claims
          to the District of Hawaii.............................................................24

C.   Transferring Plaintiff Pakka's Claims to Hawaii Would
     Not Serve the Interests of Judicial Economy and Consistency,
     Nor the Purpose of Fed. R. Civ. P. 23.................................................25

D.   Plaintiff Pakka Consents to Transfer In the Event
     That the Motions to Dismiss Are Granted ...........................................27

CONCLUSION.......................................................................................................27

# PRELIMINARY STATEMENT

Plaintiffs, Joseph and Mary Dropp, Robert and Susan Levine, and Kaarina Pakka ("Plaintiffs"), oppose Defendants' Motions to Compel Arbitration, to Dismiss, to Strike Class Action Allegations, and to Sever and Transfer Plaintiff Pakka's Claims. The goal of these motions is to foreclose Plaintiffs' opportunity to assert their claims under the federal securities laws, which should not be permitted by this Court.

Plaintiffs' Complaint alleges that Defendants are engaged in a nationwide, company-wide practice of selling unregistered securities masquerading as vacation ownership interests. The only way that these claims can be asserted is by a class action following the provisions of the Securities Act of 1933 and the Private Securities Litigation Reform Act of 1995. The sales agreements upon which Defendants rely are void because they provided for the sales of unregistered securities. An arbitrator cannot properly determine the validity of these contracts because referring the relevant issues to arbitration will deprive Plaintiffs of their rights under the federal securities laws. In addition, federal regulatory policy prevents issuers of securities from compelling arbitration of federal securities claims. Moreover, referral to an arbitrator is not required under Nevada law. Also, even if the question of the validity of the contracts is referred to arbitration, the Apollo defendants are not parties to the contracts and may not enforce their arbitration provisions. Finally, even if the validity of the contracts is referred to arbitration, this action should be stayed rather than dismissed pending the arbitration proceedings.

For the same and other reasons, as set forth below, Plaintiffs' class action allegations should not be stricken as they are essential to the adjudication of Plaintiffs' federal claims. Plaintiff Pakka's claims should not be severed as they relate to all of the class claims, and because the venue provision (allegedly requiring

1   that claims arising out of the purchase of "points" in the Hawaii Collection be
2   brought in Honolulu, Hawaii) relied upon by Defendants is unenforceable.
3   Accordingly, Defendants' motions should be denied.

### STATEMENT OF FACTS

5       This action arises out of the Defendants' sale of "points," which DRI[1] markets
6   as an investment tied to an interest in resort properties.  DRI salespeople market the
7   points as investments likely to appreciate in value that can easily be resold at a profit.
8   *See* ¶ 2.[2]  In reality, the points have no intrinsic value whatsoever, and no viable
9   secondary market exists for their resale. ¶ 77. DRI employs coercive sales techniques
10  during hours-long, one-on-one sales pitches, in which DRI salespeople tell
11  prospective investors that the points are a good investment because they: (a) are
12  being sold at a discount (providing the investor immediate "equity"); (b) are likely
13  to appreciate in value due to Defendants' managerial efforts and the appreciation of
14  the underlying real estate; (c) can be passed down to the investors' children; and (d)
15  can be sold at a profit whenever the investor wishes.  ¶¶ 70-83.  None of these
16  statements are true. Instead, investor-members find themselves saddled with tens or
17  hundreds of thousands of dollars' worth of annual "points" they could never
18  possibility utilize, in addition to being burdened by onerous maintenance fees that
19  can cost investor-members tens of thousands of dollars per year. ¶¶ 59-62.

---

[1] DRI refers to Defendants Diamond Resorts International, Inc., Diamond Resorts Holdings, LLC, Diamond Resorts Corporation, The CLUB Operating Company, Diamond Resorts U.S. Collection Development, LLC, Diamond Resorts U.S. Collection Members Association, Diamond Resorts Hawaii Collection Development LLC and Diamond Resorts Hawaii Members Association. Defendants Michael Flaskey and Kenneth Siegel are referred to as the Individual Defendants; and together DRI and the Individual Defendants are referred to as the "Diamond Defendants."

[2] References to "¶__" refer to paragraphs in the Class Action Complaint.

2

DRI is commonly thought of as "timeshare" company, but it does not sell traditional timeshare investments, in which a consumer purchases a deeded interest in real estate for the right to utilize a particular property for a particular period of time each year. ¶¶ 41-42. Unlike a traditional timeshare, DRI points are in no way tied to the value of any real estate, and DRI investor-members are not purchasing an interest in real estate. ¶ 43. Instead, DRI points merely provide investor-members with the ability to *attempt* to reserve rooms at various DRI-affiliated resort properties during various times of the year. DRI investor-members are not guaranteed access to any particular resort or property at any particular time, regardless of how many points they own. ¶ 44.

Through a convoluted system, when an investor-member purchases DRI points, he or she is actually purchasing a membership in a DRI "Collection" (for the purposes of this action, "Collection" refers to either the U.S. Collection Association, which is affiliated with resorts and hotels in California, Nevada, and elsewhere in the continental U.S., or the Hawaii Collection Association, which is primarily affiliated with resorts in Hawaii and Arizona). ¶ 45. That membership is associated with a particular points value, which is a function of how much money the investor-member has invested with DRI (obviously, the more money paid for the "membership," the more annual points are allocated to that investor-member). ¶¶ 50-52. However, because (unlike a traditional, deeded timeshare where consumers buy fractional interests in real estate that typically are for one week each year) there is no cap on how many investor-members can purchase points, and because DRI reserves the right to adjust the number or value of points needed to book a room at one of its resorts, it is impossible for any investor-member to determine the market value of his or her investment. ¶ 55.

Although it is impossible to ascertain the market value of DRI points, it is easy to determine their ongoing expense, which is massive. Each investor-member not only pays for the cost of his or her points – which is often in the hundreds of

thousands of dollars, and financed through DRI at credit card interest rates (¶ 65) – but each investor-member also pays yearly club fees, a property and services fee, closing costs, and various other charges. ¶ 59. As a result, many investor-members are making ongoing payments to the Defendants of thousands of dollars every month.

DRI's investor-members are typically not sophisticated investors. They purchase DRI points not because they expect to take multiple months of vacations every year, but because of the uniform, nationwide DRI sales pitch, which is designed to convince these individuals that DRI points are an investment which will appreciate in value and can be sold at a profit. In reality, DRI points have no intrinsic value, no viable resale market exits, and the only thing investor-members' heirs stand to inherit is debt in the form of monthly financing payments and onerous fees. ¶¶ 70-83.

The cornerstone of DRI's business model and marketing scheme is a one-on-one, high pressure sales pitch that lasts for hours and involves numerous misstatements made by DRI's salespeople. The same sales pitch is commonly utilized by DRI salespeople at offices throughout the country. In fact, DRI has touted the uniformity of its sales practices in its filings with the U.S. Securities and Exchange Commission ("S.E.C."). ¶ 68. DRI tells existing investor-members that attendance at a sales presentation is "mandatory," while new investor-members are often offered a free "experience" – for example, a trip to Las Vegas for several days – for "free," on the condition that they attend a high-pressure DRI sales pitch. ¶ 69. During the course of the sales presentation:

- The DRI sales persons will tell the target that DRI points will increase in value over time because the value of the underlying real estate will increase as a result of DRI's efforts to improve the properties and add new resorts. In reality, the points are not tied to any interest in real estate, and have no intrinsic value whatsoever. ¶¶ 70-75.

4

- If the target is an existing investor-member with points in one collection (say, the Hawaii Collection), a DRI salesperson affiliated with another collection (for example, the U.S. Collection) will tell the target that points in the salesperson's collection are more valuable or desirable, and the target should transfer their points to a different collection. In order to do that, the DRI salespersons tell the investor-member that they must purchase additional points. ¶ 105-08. In reality, as described above, the points have no intrinsic value and thus points affiliated with a particular collection are no more or less valuable than those affiliated with a different collection. ¶¶ 70-75.

- The DRI sales person will tell the target that there is a robust market for DRI points, that they can be sold for a profit at any time, and that DRI will even help them find a buyer for their points when they are ready to sell. In reality, no viable secondary market for the points exists, and DRI does not help investor-members sell their points. ¶ 78-80. Indeed, DRI has a significant interest in ensuring that no viable secondary market will ever exist because DRI can, and does, repossess points from members who are no longer able to pay for their points and fees. Moreover, DRI has made sure that it has no competition, i.e. a monopoly, for the resale of points. As such, DRI resells points at "full retail value," something DRI would not be able to do if a viable secondary market were in play. ¶ 81.

- The DRI sales persons will also tell the targets that they can leave or bequeath their points to their children or grandchildren in a will, a tactic designed to encourage the targets to view the points as a long-term investment and part of their overall financial planning. While investor-members are "ordinarily" permitted to transfer points to an immediate family member following the investor-member's death, all they are bequeathing to their heirs are debt and fees, as the points have no real value and no viable market to sell them exists. ¶¶ 82-83.

The DRI sales pitch typically lasts for several hours or longer. ¶ 69. The salesperson isolates the target or targets (if a married couple) in a room with no one other than the salesperson. At the end of this hours-long sales pitch, the salesperson presents the investor-member with several voluminous documents to sign, including a "Purchase and Security Agreement". The target is not permitted to take the

5

1  purchase agreement or any of the accompanying documents out of the room before
2  signing. ¶¶ 89-91. The target is not permitted to review the purchase agreement with
3  his or her attorney, investment advisor, or anyone else, prior to signing. *Id.* The
4  purchase agreement is presented as a "take it or leave it" contract of adhesion – the
5  target is not given any opportunity to negotiate its terms. *Id.*

6       All of the Plaintiffs here received the DRI sales pitch described above and in
7  the Class Action Complaint. In total, the Plaintiffs have spent approximately $1.2
8  million on DRI points during the Class Period. Sections 5(a) and 5(c) of the
9  Securities Act prohibit the sale of any security "unless a registration statement has
10  been filed as to such security." 15 U.S.C. § 77e. Registration of a security with the
11  S.E.C. is not a perfunctory or simple process, and instead requires issuers of
12  securities to provide extensive, detailed information about risk factors, use of
13  proceeds, determination of offering price, and various other information. ¶ 134.
14  Although the DRI points are an investment contract and thus a security under federal
15  law, Defendants have failed to register them with the S.E.C., and thus have violated
16  Sections 5(a), 5(c), 12(a)(1), and 15(a) of the Securities Act. Plaintiffs have brought
17  this class action before this Court in order to exercise their rights under federal
18  securities law.

19
20  **ARGUMENT**
21  **I.   DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND
          DISMISS PLAINTIFFS' CLAIMS SHOULD BE DENIED**
22
23      **A.   The Arbitration Provisions Are Unenforceable Because the Entire
            Sales Agreements Constitute Sales of Unregistered Securities
24          and Are Thus Void Under State and Federal Law**

25       The arbitration agreements in the contracts signed by all Plaintiffs are void
26  and unenforceable because they are part of a contract for the sale of unregistered
27  securities. Federal law provides that "[e]very contract...the performance of which
28  involves the violation of, or the continuance of any relationship or practice in

violation of [federal securities laws] shall be void." 15 U.S.C. § 78cc; *see also* 15 U.S.C. § 77n (similar provision in Securities Act). Section 12(a)(1) of the Securities Act provides for the recovery in any Court of competent jurisdiction of the consideration paid for the purchase of an unregistered security.   15 U.S.C. § 77l(a)(1).  A contract for a sale of an unregistered security is voidable at the option of the purchaser. *See A.C. Frost & Co. v. Coeur D'Alene Mines Corp*, 312 U.S. 38 (1941); *see also Hays v. Adam*, 512 F. Supp. 2d 1330 (N.D. Ga. 2007) (finding contracts for sale of unregistered securities to be void); *see also Michelson v. Voison*, 658 N.W.2d 188, 191 (Mich. Ct. App. 2003) (contract for the sale of an unregistered security is void, including its arbitration provision).[3]

As set forth in the Complaint, the contracts between Plaintiffs and the DRI Defendants constitute the sale of a security, insofar as the DRI sales model requires DRI sales people to "pitch" DRI points to prospective investors as an investment that will appreciate in value.  Defendants have failed to register their points with the S.E.C., and thus, the sale of such points constitutes an unregistered security under federal law. *See* 15 U.S.C. §§ 77e(a), 77e(c), & 77l(a)(1).  Under Nevada law, the party seeking to enforce an arbitration clause bears the burden of establishing the clause is valid. *See Gonski v. Second Judicial Dist. Court of Nev.*, 126 Nev. 551, 558 (2010).  Nevada law clearly provides that contracts founded on acts prohibited

---

[3] In their brief, the Defendants Apollo Management VIII L.P. and Apollo Global Management (the "Apollo Defendants") state that the Securities Act does not provide that contracts for the sale of unregistered securities are void (Apollo Defendants' Motion to Compel Arbitration of the Dropps' and Levines' Claims; (2) Dismiss their Claims in this Action; and (3) Strike their Class Claims and Require that Arbitration Proceed on an Individual, not Consolidated, Basis ("Apollo Mem.") at 11:11-17), but courts have stated that such contracts are voidable at the option of the purchaser of the securities. *See A.C. Frost & Co.*, 312 U.S.at  40-41; *see also Straley v. Universal Uranium & Milling Corp.*, 182 F. Supp. 940, 942 (S.D. Cal. 1960) (a sale in violation of the Securities Act is "voidable at the option of the purchaser").

1   by statute, or in violation of public policy (such as the sale of unregistered securities)

2   are void. *See, e.g.*, *Rivero v. Rivero*, 125 Nev. 410, 419 (2009) ("Parties are free to

3   contract, and the courts will enforce their contracts if they are not unconscionable,

4   illegal, or in violation of public policy). Thus, as part of an unenforceable and void

5   contract, the arbitration agreement is likewise void, and, as set forth in Section I(A),

6   *infra*, requiring the Dropp and Levine Plaintiffs to submit to individual arbitration

7   to determine the validity of this contract would deprive them of their rights under

8   the Securities Act and the Private Securities Litigation Reform Act ("PSLRA").

9        In their brief, the Diamond Defendants argue that, under *Rodriguez de Quijas*

10  *v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989), Plaintiffs' claims under

11  the Securities Act are subject to arbitration, but this decision did not involve an

12  issuer's sale of unregistered securities, and is thus irrelevant. In *Rodriguez*, the

13  plaintiffs brought claims against their broker, alleging that the broker had engaged

14  in fraudulent and unauthorized transactions in violation of federal securities laws,

15  and the Supreme Court found that, generally speaking, claims for violations of

16  federal securities could be subject to an enforceable, conscionable arbitration clause.

17  No such clause exists in this case, however, because, as a contract for the sale by the

18  issuer of unregistered securities, the entire agreement – including the arbitration

19  clause – is void. *See* 15 U.S.C. § 78cc; *see also Michelson*, 658 N.W.2d at 191.

20   **B.   The Arbitration Provisions are Unenforceable, And Their**
21        **Applicability Cannot Be Determined by an Arbitrator, Because**
         **Their Application Would Preclude Plaintiffs from Exercising**
22        **Their Statutory Rights**

23        The Diamond and Apollo Defendants reiterate multiple times through their

24  respective briefs that the Federal Arbitration Act ("FAA") "reflects strong policy

25  favoring arbitration of disputes." *See, e.g.*, Diamond Defendants' Motion to Dismiss

26  and Compel Arbitration and to Strike Class Action Allegations as to Plaintiffs Joseph

27  M. Dropp, Mary E. Dropp, Robert Levine, and Susan Levine ("Diamond Mem.") at

28

8

1   10:4-5, quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1,

2   24 (1983).  However, the Supreme Court has held that, notwithstanding the mission

3   of the FAA, a court can and should invalidate an arbitration agreement when such

4   agreement serves as a "prospective waiver of a party's right to pursue statutory

5   remedies." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013); *see*

6   *also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637

7   n.19 (1985) ("[I]n the event the choice-of-forum and choice-of-law clauses operated

8   in tandem as a prospective waiver of a party's right to pursue statutory remedies…we

9   would have little hesitation in condemning the [arbitration agreement] as against

10  public policy.").  This case is a clear example of an arbitration agreement precluding

11  a plaintiff from bringing a federal securities claim. An arbitrator, who is  limited to

12  adjudicating Plaintiffs' and each class member's claims one at a time, would be

13  unable to vindicate Plaintiffs' federal statutory rights. Thus, the arbitration

14  agreement, including the class action waiver contained in the U.S. Collection PSA,

15  is void in its entirety.

16      The arbitration agreements signed by the Dropp Plaintiffs and the Levine

17  Plaintiffs all contain a class action waiver provision, which states, in part, that "no

18  bound party may participate in a class action in court or in class-wide arbitration,

19  either as a representative, class member or otherwise, with respect to any claim." *See*

20  Apollo Mem. at 7:16-27.  However, Plaintiffs' claims are *dependent* upon their class

21  allegations – Plaintiffs allege that the Diamond salesforce engages in a common,

22  class-wide process designed to sell points as investment contracts and therefore

23  securities. *See, e.g.*, ¶¶ 67-87.  Moreover, as discussed below (*infra* at Sections I(B)

24  and II ), the Private Securities Litigation Reform Act ("PSLRA") provides a national,

25  uniform right to bring securities class actions in federal district court.   Thus, if

26  Plaintiffs are prevented from demonstrating class-wide conduct as a result of the

27  arbitration clauses here, they will be precluded both from (a) proving the common

28  sales practices alleged herein that form the basis of their claims under Section 5; and

9

1   (b) vindicating class-wide claims as protected under the PSLRA. Simply put,

2   Diamond's arbitration provision is a thinly veiled effort to deprive Plaintiffs of their

3   right to assert claims that Diamond is selling unregistered securities.

4         Courts confronted with similar circumstances have invalidated arbitration

5   clauses when their application would essentially preclude the plaintiff from bringing

6   his or her statutory claim. In *Eisen v. Venulum Ltd.*, 244 F. Supp. 3d 324 (W.D.N.Y.

7   2017), the plaintiff sought to bring a claim for violation of federal securities against

8   the defendant, from whom he had purchased securities.  In connection with that

9   purchase, he had signed a contract which contained an arbitration agreement stating

10   that any dispute would be subject to binding arbitration in the British Virgin Islands

11   ("BVI") applying only BVI law, which does not provide for the application of

12   federal securities law. *Id.* at 344.  The *Eisen* court concluded that the defendants had

13   "attempted to use BVI law to avoid the requirements of federal securities laws," and

14   therefore their arbitration clauses were "unconscionable and void as against public

15   policy." *Id.* at 344-45; *see also Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 673

16   (4th Cir. 2016) (finding that district court erred in ordering arbitration when

17   arbitration clause at issue, in contract issued by payday lender, provided that

18   agreement was subject only to tribal laws, and U.S. state and federal law did not

19   apply); *Gingras v. Rosette*, No. 5:15-cv-101, 2016 U.S. Dist. LEXIS 66833, at *54

20   (D. Vt. May 18, 2016) ("[A]n arbitration agreement created to preclude federal and

21   state consumer protections is unenforceable as unconscionable.").  Likewise,

22   Defendants' use of a class action waiver, combined with the rest of the arbitration

23   clause, precludes the Plaintiffs from bringing their claims under the federal securities

24   laws, and is thus unconscionable and unenforceable.

25         Similarly, in their brief, the Apollo Defendants argue that the arbitrator, and

26   not this court, must decide whether the contracts for the sale of unregistered

27   securities at issue in this case are unconscionable and unenforceable (Apollo Mem.

28   at 12). However, as set forth above, in this context such an approach would deprive

10

1  Plaintiffs of their right to bring a claim under the Securities Act because a key
2  component of their claims is Defendants' uniform message, which was made to the
3  entire class. Likewise, as set forth in Section II below, referral to an arbitrator would
4  deprive Plaintiffs of their right to bring a securities claim as a class action under the
5  PSLRA.

### C.   Arbitration Agreements Are Not Permitted in Registration Statements and Thus are Void in the Purchase Agreements

8  Enforcing the arbitration provisions at issue in this action would not only
9  violate Nevada and federal law pertaining to the enforceability of a contract for the
10  sale of unregistered securities (*see* Sections I(A) and (B), *supra*), it would also
11  contravene long-established S.E.C. policy regarding plaintiffs' rights to bring
12  securities actions.  For decades, the S.E.C. has made clear that it does not permit the
13  practice of placing arbitration clauses in a corporation's charter or other founding
14  documents that would require any shareholder to arbitrate any claims arising out of
15  the shareholder's purchase of that company's stock.  In 2012, it was widely reported
16  that the Carlyle Group was compelled to remove a mandatory arbitration clause from
17  the registration statement it filed with the S.E.C. in connection with its IPO.  *See*
18  Karan Singh Tyag, *Carlyle Leaves Out Mandatory Arbitration Clause in IPO*,
19  Kluwer    Arbitration    Blog    (Feb.    7,    2012),    *available    at*
20  http://arbitrationblog.kluwerarbitration.com/2012/02/07/carlyle-leaves-out-
21  mandatory-arbitration-clause-in-ipo/.  Indeed, the S.E.C. has disfavored such
22  arbitration provisions since at least 1990, when it rejected Franklin First Financial
23  Corp's inclusion of such a provision in its corporate bylaws.  In 2013, in a speech
24  before the North American Securities Administrators Association, SEC
25  Commissioner Luis A. Aguilar reiterated this position, stating that "by providing
26  investors with the ability to choose the forum in which to bring their legal claims
27  and protect their legal rights, we enhance investor protection and add more teeth to
28  our federal securities laws." Luis A. Aguilar, "Outmanned and Outgunned: Fighting

on Behalf of Investors Despite Efforts to Weaken Investor Protections," April 16, 2013, *available at* https://www.sec.gov/news/speech/2013-spch041613laahtm.   The   S.E.C.   recognizes   that   permitting corporations to require all shareholders to arbitrate their claims against an issuer of securities would have a devastating impact on their rights.

Here, Defendants' use of an arbitration clause in the Purchase Agreements is directly akin to an arbitration clause in a corporation's charter or bylaws.  As set forth above and in the Complaint, Diamond's Purchase and Security Agreement constitutes a sale of an unregistered security.  As such, the Purchase and Security Agreement is analogous to the formational agreements that a company offering registered securities for sale would be required to file with the S.E.C.  Therefore, including an arbitration agreement in such documents is directly at odds with the stated policy of the S.E.C. pertaining to such arbitration provisions and should be determined by this Court to be void as contrary to firmly-established federal regulatory policy.

### D.   The Arbitration Agreements are Unenforceable Because They Are Procedurally and Substantively Unconscionable

The arbitration provisions contained in the Purchase Agreements signed by the Dropp and Levine Plaintiffs are unconscionable under Nevada law, and thus void and unenforceable.   Nevada law provides that, while "both procedural and substantive unconscionability must be present for a court to exercise its discretion to refuse to enforce an unconscionable contract, 'they need not be present to the same degree.'" *Siy v. CashCall, Inc.*, No. 2:13-cv-00953, 2014 U.S. Dist. LEXIS 1472, at *25 (D. Nev. Jan. 6, 2014), quoting *Armendariz v. Foundation Health Psychcare*

12

*Servs., Inc.*, 6 P.3d 559, 590 (Cal. 2000).[4] Here, Plaintiffs can demonstrate that the arbitration provisions are both procedurally and substantively unconscionable.

### 1.   The Arbitration Provisions Are Procedurally Unconscionable

"An arbitration clause is procedurally unconscionable under Nevada law when a party lacks a meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract, or because the clause and its effects are not readily ascertainable upon a review of the contract." *Siy*, 2014 U.S. Dist. LEXIS 1472, at * 25. The arbitration clauses in the Purchase Agreements are unquestionably contracts of adhesion. They are presented, fully drafted, in a "take it or leave it" manner, to investor-members, including the Dropp and Levine Plaintiffs. ¶ 89. *See* Declaration of Joseph and Mary Dropp in Support of Plaintiffs' Opposition to Defendants' Motions to Compel Arbitration, Strike Class Allegations and Dismiss the Class Action Complaint ("Dropp Decl.") at ¶ 5; Declaration of Robert and Susan Levine in Support of Plaintiffs' Opposition to Defendants' Motions to Compel Arbitration, Strike Class Allegations and Dismiss the Class Action Complaint ("Levine Decl.") at ¶5. Those Plaintiffs were not provided any opportunity to negotiate the terms of the arbitration provision or to object to its inclusion in the Purchase Agreements. Dropp Decl. ¶¶ 5-6; Levine Decl. ¶¶ 5-6. Indeed, the Plaintiffs, like other investor-members, signed their Purchase Agreements after being subjected to an hours-long sales pitch, and lacked the wherewithal to challenge its terms. Dropp Decl. ¶ 4; Levine Decl. ¶ 4. Moreover, the parties are plainly of unequal bargaining power. The Diamond Defendants are

---

[4] Defendants will likely argue that, under *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016), the arbitration agreements at issue in this action are procedurally conscionable, but the arbitration agreement at issue in that action (contained in a contract between the Uber ridesharing company and its independent drivers) was not entered into following an hours-long, aggressive sales pitch, with no opportunity to reflect, as is the case with Diamond's sales process.

13

multi-national, multi-billion dollar corporations with the ability to consult with attorneys, business experts, and other advisors before drafting and creating the Purchase and Security Agreements (which they did, of course, with zero input from the Dropp or Levine Plaintiffs, or any other investor-member), and the Diamond Defendants enter into thousands of near-identical Purchase Agreements ever year. In stark contrast, the Dropp and Levine Plaintiffs are individuals who were not so much as provided with the opportunity to have an attorney or other advisor review their adhesion arbitration provision, let alone provided the ability to negotiate its terms. Dropp Decl. ¶ 6; Levine Decl. ¶ 6. Indeed, Diamond point purchasers are not even permitted to leave the sales offices before they sign. ¶¶ 90-91. Likewise, unlike the Diamond Defendants, the Dropp and Levine Plaintiffs entered into only a handful of Purchase Agreements in their lives.

Ninth Circuit and Nevada courts have found similar arbitration provisions to be procedurally unconscionable. *See, e.g.*, *Circuit City Stores v. Adams*, 279 F.3d 889, 893 (9th Cir. 2002) (adhesion contract, as "a standard-form contract, drafted by the party with superior bargaining power, which relegates to the other party the option of either adhering to its terms without modification or rejecting the contract entirely," is procedurally unconscionable); *KJH & RDA Investor Group LLC v. Eighth Judicial Dist. Court*, No. 51159, 2009 Nev. LEXIS 89, at *3-4 (Nev. Apr. 22, 2009) (after noting that adhesion contracts are procedurally unconscionable, finding that a contract between a plaintiff investor group and a defendant seller of condominiums was not an adhesion contract because the terms of the contract indicated that the plaintiff would have the right to review with an attorney before signing).

### 2. The Arbitration Provisions Are Substantively Unconscionable

Under Nevada law, "[s]ubstantive unconscionability 'focuses on the one-sidedness of the contract terms.'" *Siy*, 2014 U.S. Dist. LEXIS 1472, at * 25-26,

1   quoting *D.R. Horton Inc. v. Green*, 120 Nev. 549, 554 (2004).  Courts have found

2   arbitration agreements that require a party to forgo a substantive right to be

3   unconscionable.  *See, e.g., Hayes*, 811 F.3d at 673.  Here, as described in Sections

4   I(A) and (B), *supra* and Section II, *infra*, the arbitration provision essentially

5   requires Plaintiffs to forgo their claims under federal securities law, and thus, the

6   agreements are unconscionable.

7        Thus, the arbitration provisions in the Purchase Agreements signed by the

8   Dropp and Levine Plaintiffs are both procedurally and substantively unconscionable,

9   and the Court must therefore deny Defendants' motion to compel arbitration.

10  **E.      Even if Enforceable, the Arbitration Provisions do not Apply to**

11  **        the Apollo Defendants**

12       The Apollo Defendants argue that, despite the fact that they are not signatories

13  to the Purchase and Security Agreements and are not mentioned by name anywhere

14  in the Agreements, they are entitled to invoke the arbitration clause. Ninth Circuit

15  law is clear that the right to compel arbitration "may not be invoked by one who is

16  not a party to the agreement and does not otherwise possess the right to compel

17  arbitration." *Britton v. Co-Op Banking Grp.*, 4 F.3d 742, 744 (9th Cir. 1993). Indeed,

18  the Ninth Circuit has held that a purchaser of a company cannot invoke an arbitration

19  clause in an agreement signed by the purchased company and the plaintiff – precisely

20  the situation set forth in the instant action.   In *Britton*, the plaintiff brought a

21  securities fraud claim against the defendant, who had purchased the company from

22  which the plaintiff had bought the securities at issue.   The contract between the

23  company and the plaintiff contained an arbitration provision; however, the Ninth

24  Circuit concluded that the defendant purchaser could not invoke the provision

25  because (a) he was not a third-party beneficiary to the contract; (b) he was not a

26  successor in interest to the contract; and (c) he was not within a class of agents

27  intended to benefit from the arbitration clause, insofar as the allegations against him

28  in the complaint did not arise from the contract at issue. *Id.* at 747.  Here, the facts

15

are similar – the Apollo Defendants purchased the Diamond Defendants on September 2, 2016, and the Apollo name does not appear *anywhere* on the Purchase Agreements or within the arbitration clause.  Moreover, the Purchase Agreements, as set forth above, are unenforceable contracts for the sale of unregistered securities (see Section I(A), *supra*).  For all of these reasons, the Apollo Defendants do not fall within "a class of agents intended to benefit from the arbitration clause."  *Id.* at 747.

The Apollo Defendants argue that Plaintiffs are equitably estopped from arguing that they cannot invoke the arbitration provision, but this is not the case under Nevada law.  "[E]quitable estoppel of third parties [in the context of invoking an arbitration provision] is narrowly confined."  *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013), citing *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042 (9th Cir. 2009).  In order for equitable estoppel to apply, the Apollo Defendants must show one of two circumstances:  (a) where the signatory to the written contract must "rely on the terms of the written agreement in asserting its claims," or (b) where the signatory raises "allegations of substantially interdependent and concerted misconduct" by the nonsignatory and the signatory, and such allegations are "founded in or intimately connected with the obligations of the underlying agreement." *Dylag v. W. Las Vegas Surgery Ctr., LLC*, No. 16-15869, 2017 U.S. App. LEXIS 25197, at *4-5 (9th Cir. Dec. 13, 2017), quoting *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013).  In other words, in order for a nonsignatory to invoke an arbitration clause under either Nevada law or Ninth Circuit precedent, the allegations set forth in the complaint must be closely linked to, if not directly related to, the contract containing the arbitration clause.  *See, e.g.*, *Dylag*, 2017 U.S. App. LEXIS 35197 (nonsignatory may not invoke arbitration clause from an agreement unrelated to claims against nonsignatory); *Kramer*, 705 F.3d at 1128-29 (car manufacturer nonsignatory defendant could not invoke arbitration clause in agreement between plaintiff car purchaser and the dealership that sold the car because the consumer law claims did not "rely on the existence of

16

1   a purchase agreement"). Here, the Plaintiffs' claims are for violation of the Securities

2   Act of 1933 – they do not rely upon the terms of the Purchase and Security

3   Agreements, nor do they allege any claim for breach of such  Agreements.

4           The Apollo Defendants cite decisions from New York, Florida, and the

5   Second Circuit to support their position that, as "control persons" of the Diamond

6   Defendants, the Apollo Defendants have standing to invoke the arbitration provision,

7   but these cases are all distinguishable on the facts.  *See Roby v. Corporation of*

8   *Lloyd's*, 996 F.2d 1353 (2d Cir. 1993) (finding that "employees or disclosed agents

9   of an entity that is a party to an arbitration agreement are protected by that

10  agreement"); *Wubben v. Kirkland*, No. 6:08-cv-1105, 2008 U.S. Dist. LEXIS

11  127941 (M.D. Fla. Dec. 22, 2008) (claims against managing members subject to

12  arbitration); *Dassero v. Edwards*, 190 F. Supp. 2d 544 (W.D.N.Y. 2002) (defendant,

13  who signed contract containing arbitration clause as defendant company's president,

14  had standing to invoke arbitration clause); *Fraternity Fund Ltd. v. Beacon Hill Asset*

15  *Mgmt. LLC*, 371 F. Supp. 2d 571 (S.D.N.Y. 2005) (nonsignatory defendant company

16  can invoke arbitration clause when the signatory defendant and nonsignatory

17  defendant shared the same officers and directors, and the claims in the case were

18  "intertwined" with the contracts containing the arbitration clause).  Here, the Apollo

19  Defendants are not "employees or disclosed agents" of the Diamond Defendants, nor

20  do they share officers, directors, or other employees. Rather, the Apollo Defendants

21  simply purchased and own the Diamond business. Thus the Apollo Defendants have

22  no standing to invoke the arbitration provisions.

23  **II.    DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' CLASS**

24  **ALLEGATIONS SHOULD BE DENIED**

25          The Apollo and Diamond Defendants both move to strike the Levine and

26  Dropp Plaintiffs' class allegations on the grounds that the arbitration clauses in the

27  contracts they signed contained provisions waiving their right to bring a class action.

28  These motions should be denied. First, the class action waivers contained in the

1  arbitration clauses are unenforceable for the same reasons the arbitration provisions
2  themselves are unenforceable:  the arbitration provisions are part of a contract for
3  the sale of unregistered securities.  Moreover, they do not apply to the Apollo
4  Defendants because the Apollo Defendants do not fall within the definition of a
5  "Company Party." As such, the Apollo Defendants lack any standing or contractual
6  right to demand arbitration.

7      Moreover, the Defendants' motions to strike the class allegations should also
8  be denied because the class action waivers, applied in this contract, would preclude
9  the Levine and Dropp Plaintiffs for exercising a substantive federal right – the right
10  to assert federal securities claims as a class action, as set forth in the Private
11  Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a).  The PSLRA
12  sets forth precise requirements for plaintiffs in "each private action arising under this
13  chapter that is brought as a plaintiff class action pursuant to the Federal Rules of
14  Civil Procedure."  15 U.S.C. § 78u-4(a)(1).  As reflected in the statute's legislative
15  history, Congress enacted the PSLRA for the explicit purpose of "encourag[ing] the
16  most capable representatives of the plaintiff class to participate in class action
17  litigation" as such lawsuits "promote public and global confidence in our capital
18  markets and help to deter wrongdoing and to guarantee that corporate officers,
19  auditors, directors, lawyers and others properly perform their jobs." H.R. Rep. No.
20  104-369.  A class action waiver, such as the one in the arbitration clauses in the
21  agreements signed by the Dropp and Levine Plaintiffs, would, by definition, prevent
22  those Plaintiffs from exercising their right, set forth in the PSLRA, to bring a federal
23  securities class action.

24      In an analogous case, the Ninth Circuit held that when a class action waiver
25  precluded a plaintiff from exercising his right to bring a collective action under the
26  National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 157, 158, "the saving clause
27  of the [Federal Arbitration Act ["FAA"] prevents the enforcement of that waiver."
28  *Morris v. Ernst & Young, LLP*, 834 F.3d 975, 987 (9th Cir. 2015), *cert. granted*,

1   2017 U.S. LEXIS 689 (U.S., Jan. 13, 2017).  The savings clause of the FAA provides

2   that an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon

3   such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.

4   § 2.  The court noted that "[w]hen an illegal provision…is found in an arbitration

5   agreement, the FAA treats the contract like any other; the FAA recognizes a general

6   contract defense of illegality….The term may be excised, or the district court may

7   decline enforcement of the contract altogether." *Morris*, 834 F.3d at 985.  The Ninth

8   Circuit concluded that the class action waiver was an "illegal provision" insofar as

9   it precluded the plaintiff from exercising a right to collective action, and remanded

10  the case to the district court to determine whether the waiver could be excised from

11  the arbitration agreement. *Id.* at 990. In the instant case, the class action waiver – as

12  well as the entire arbitration clause, as discussed above (*see* Sections I(A) and (B),

13  *supra*) – is likewise illegal insofar as it precludes plaintiffs from exercising their

14  right to bring a private securities class action under the PSLRA, and is thus

15  unenforceable.

16  ## III.   DEFENDANTS' MOTIONS TO DISMISS THE DROPP AND LEVINE
17  PLAINTIFFS' CLAIMS SHOULD BE DENIED

18          Both Defendants styled their motion papers as constituting, *inter alia*, motions

19  to dismiss the Dropp and Levine Plaintiffs' claims, but only the Apollo Defendants

20  address this point in their brief (Apollo Mem. at 16:19-27), arguing that the

21  arbitration clause is broad enough to warrant such dismissal, but that is not the case.

22  As set forth above, the arbitration clause at issue does not cover the Dropp and

23  Levine Plaintiffs' claims under federal law, nor does it apply to the Apollo

24  Defendants.  Thus, dismissal of this action is inappropriate. *See, e.g.*, *Zabelny v.*

25  *CashCall, Inc.*, No. 2:13-cv-00853, 2014 U.S. Dist. LEXIS 2626, at *42 (D. Nev.

26  Jan. 7, 2014) (dismissing claims when all claims must be arbitrated and the plaintiffs

27  preferred dismissal to a stay).

28

1   Moreover, even if this Court does determine that the validity of the Purchase
2   Agreements must be determined by an arbitrator, the Court should stay the Dropp
3   and Levine Plaintiffs' claims so that, in the event the arbitrator(s) determine that the
4   Purchase Agreements are unenforceable agreements for the sale of unregistered
5   securities, the Dropp and Levine Plaintiffs may return to this Court for the proper
6   adjudication of their claims.

7   **IV.   THE DIAMOND DEFENDANTS' MOTION TO SEVER PLAINTIFF
8         PAKKA'S CLAIMS AND TRANSER VENUE SHOULD BE DENIED**

9   The Diamond Defendants move, pursuant to 28 U.S.C. § 1404(a), to transfer
10  venue for Plaintiff Pakka's claims to the U.S. District Court for the District of
11  Hawaii.  The sole grounds for this motion is the existence of a forum selection clause
12  in the Purchase Agreement or Credit Sale Contract signed by Plaintiff Pakka, which
13  states that "any lawsuit or legal proceeding relating to this agreement, the note, the
14  escrow agreement, the collection, the collection instruments, or the CLUB® must
15  be filed and heard only in a federal or state court located in Hawaii." Diamond
16  Defendants' Motion to Sever Plaintiff Kaarina Pakka's Claims and Transfer Venue
17  ("Transfer Mem.") at 4:24-5:11.  This forum selection clause is unenforceable for
18  several reasons, and thus the Diamond Defendants' motion should be denied.

19  **A.   The Forum Selection Clause is Unconscionable and
20        Unenforceable Because it Requires Individual Investor-Members
21        to Litigate Their Claims in a Far-Flung Jurisdiction**

22  Both the Ninth Circuit and Nevada courts[5] have held that forum selection
23  clauses that require litigants to travel thousands of miles to adjudicate their claims
24  are unconscionable and thus unenforceable.  *See, e.g.*, *Comb v. Paypal, Inc.*, 218 F.

---

25  [5] A federal court applies the forum state's law in determining the conscionability of
26  a contractual provision. *HDAV Outdoor LLC v. Elite Mobile Adver. LED Billboards
27  Inc.*, No. 67437, 2015 Nev. App. Unpub. LEXIS 637 (Ct. App. Dec. 29, 2015)
    (applying Nevada law to determine conscionability of forum selection clause
28  requiring matters to be litigated in Florida).

1    Supp. 2d 1165, 1177 (N.D. Cal. 2002) (forum selection clause requiring consumers
2    residing throughout the United States to sue in Santa Clara County, California, was
3    unreasonable and unenforceable).  Moreover, "if the place and manner restrictions
4    of a forum selection provisions are 'unduly oppressive,' or have the effect of
5    shielding the stronger party from liability, then the forum selection provision is
6    unconscionable." *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622
7    F.3d 996, 1005 (9th Cir. 2010), quoting *Nagramp v. MailCoups, Inc.*, 469 F.3d 1257,
8    1287 (9th Cir. 2006).

9         Here, the forum selection clause is both procedurally and substantively
10   unconscionable.  Procedurally, it is deficient because it was not bargained for nor
11   negotiated at arms'-length but rather presented to Plaintiff Pakka as a contract of
12   adhesion following an aggressive sales pitch that lasted several hours. ¶¶ 89-91, 112-
13   15; *see also* Declaration of Kaarina Pakka in Support of Plaintiffs' Opposition to
14   Defendants' Motions to Compel Arbitration, Strike Class Allegations and Dismiss
15   the Class Action Complaint ("Pakka Decl.") at ¶¶ 4-5.  Plaintiff Pakka was not given
16   a reasonable opportunity to review the terms of the agreement before signing.  ¶¶
17   89-91; *see also* Pakka Decl. ¶ 6.  Ninth Circuit courts have concluded that forum
18   clauses signed by consumers or employees under similar circumstances are
19   procedurally unconscionable.  *See* Section I(D)(1), *supra*; *see e.g.*, *Nagrampa*, 469
20   F.3d at 1290 (Ninth Circuit finds forum selection clause in adhesion contract that
21   requires franchisee to litigate thousands of miles from home to be unconscionable);
22   *Comb*, 218 F. Supp. 2d at 1177.

23        Second, the forum selection clause is substantively unconscionable because
24   the "place" restrictions are "unduly oppressive." *Bridge Fund*, 622 F.3d at 1005.
25   The forum selection clause at issue here requires Diamond investor-members like
26   Plaintiff Pakka – virtually all of whom sign their respective purchase agreements
27   while in Hawaii on vacation, and do not reside in Hawaii – to travel to Hawaii, a
28   state located 2,390 miles away from the continental United States, on an island in

21

the middle of the Pacific Ocean, if they wish to bring an action against the Diamond Defendants.  None of the Diamond Defendants are incorporated in Hawaii, nor are their principal places of business located there.  ¶¶ 26-33.  Courts have found similar forum selection clauses to be substantively unconscionable and unenforceable. *See, e.g.*, *Comb*, 218 F. Supp. 2d at 1177.[6]

## B.   It is Not in the Public Interest to Transfer Plaintiff Pakka's Claims

As set forth in Section IV(A) above, the forum selection clause at issue in this action is invalid and unenforceable under clear Ninth Circuit precedent, and thus this Court need not consider the various public interest considerations set forth in *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 62-64 (2013).  However, even if this Court concludes that the forum selection provision is valid, the public interest factors outlined in *Boston Telecomms. Group, Inc. v. Wood*, 588 F.3d 1201, 1211 (9th Cir. 2009) weigh in favor of denying the Diamond Defendant's motion to transfer Plaintiff Pakka's claims.

## 1.   The District of Hawaii Has No Local Interest in this Action

The District of Hawaii has no meaningful interest in this action.  Plaintiff Pakka does not live in Hawaii.  ¶ 22.  None of the Defendants are incorporated in

---

[6] Defendants will likely cite to *Carnival Cruise Lines v. Shute*, 499 U.S. 585 (1991), the Supreme Court decision that concluded that a forum selection clause in a ticket contract between a passenger and a cruise ship company that required passengers to bring suit in Florida (even though consumer lived in Washington and boarded ship in California) was valid.  However, shortly after the Supreme Court's decision in this case, Congress passed 46 U.S.C. § 30509, which prohibits the use of such forum selection clauses in contracts between cruise ship companies and passengers.  Moreover, in *Carnival Cruise*, the defendant cruise company had its principal place of business in Florida, and the Court found that this fact belied any suggestion of a bad-faith motive.  *Id.* at 595.  Here, none of the Defendants are incorporated in Hawaii nor do they have their principal places of business in that state.

22

Hawaii nor do any of them have principal places of business in Hawaii. ¶¶ 26-33. Additionally, the Diamond "points" at issue in this litigation are not directly tied to any particular piece of real estate; rather, they only represent use rights. Moreover, investor members do not own any ownership interest in real estate. (¶¶ 43)  Indeed, the only connection between Hawaii and this litigation is that Diamond operates resorts there and Plaintiff Pakka signed the Purchase Agreement and received the sales pitch while on vacation in Hawaii. ¶¶ 114-15.

In contrast, Nevada has a significant interest in this litigation. First, almost all of the Diamond Defendants have principal places of business in Nevada. ¶¶ 26-33.[7] A district court has a significant interest in adjudicating cases involving the business activities of corporations housed in that state. *See, e.g.*, *Peach v. Shopshire*, No. CV05-0369C, 2005 U.S. Dist. LEXIS 9479, at *35 (W.D. Wash. Feb. 23, 2006) (a state has "more than a minimal interest in adjudicating an action involving a business engaged in continuous and substantial business activity within its borders"). Second, as set forth in further detail in Section IV(C), below, this Court has an interest in litigating this class action as a whole, rather than transferring Plaintiff Pakka's claims – which are identical to the other Plaintiffs' claims – to another district court. Assuming the Defendants' motions to compel arbitration of the Dropp and Levine Plaintiffs' claims are denied, this action will be before this Court, and it has a significant interest in litigating this action as a whole. *See* Section IV(C), *infra*.

## 2. The District of Hawaii Has No Special Familiarity with the Federal Securities Law at Issue in this Action

The Diamond Defendants argue that Hawaii is most familiar with the law governing Plaintiff Pakka's claims because Hawaii law governs the Purchase Agreement Plaintiff Pakka signed (Diamond Mem. at 7:22-8:6), but the choice of law provision in Plaintiff Pakka's agreement is irrelevant to this analysis.  Neither

---

[7] Only Defendant Diamond Resorts Corporation has a principal place of business not located in Nevada. ¶ 28.

Plaintiff Pakka, nor any other Plaintiff, brings any claims for breach of contract under the terms of the Purchase Agreement.  Instead, Plaintiff Pakka's claims (like all the Plaintiffs' claims) are for violations of federal securities law arising out of the Diamond Defendants' practice of selling its "points" as investment contracts.  ¶¶ 143-49.  The Diamond Defendants do not, and indeed, cannot, allege that the District of Hawaii is more familiar with federal securities law than the District of Nevada (or any other federal court).  Thus, this factor does not weigh in favor of transfer.

### 3. None of the Other Public Interest Factors Weigh in Favor of Transferring Plaintiff Pakka's Claims to the District of Hawaii

The remaining public interest factors are: (1) the burden on local courts and juries, (2) congestion in the court, and (3) the costs of resolving a dispute unrelated to a particular forum. *See Boston Telecomm.*, 488 F.3d at 1211.  As set forth in further detail in Section IV(C) below, it is not in the interest of *either* this Court *or* the District of Hawaii – indeed, it is not in the interest of the federal courts as a whole – to transfer the claims of one named plaintiff in a class action to a different forum while another forum adjudicates the identical claims of the remaining plaintiffs. Such a transfer is directly at odds with principles of judicial economy, and would indeed create a burden for all federal courts, as well as congestion, potentially disparate decisions regarding identical legal issues, and all of the costs and expenses associated therewith.  *See* Advisory Committee Notes, 1966 Amendment to Fed. R. Civ. P. 23(b)(1)(A) ("Separate actions by individuals…might create a risk of inconsistent or varying determinations.").  As such, under all of the "public interest factors," the Diamond Defendants' motion to sever and transfer Plaintiff Pakka's claims should be denied.

24

**C.   Transferring Plaintiff Pakka's Claims to Hawaii Would Not Serve the Interests of Judicial Economy and Consistency, Nor the Purpose of Fed. R. Civ. P. 23**

The Diamond Defendants' motion to sever and transfer Plaintiff Pakka's claims should also be denied because it is antithetical to the purposes of Rule 23 – goals of judicial efficiency and the avoidance of piecemeal litigation and inconsistent judgments. As such, the Diamond Defendants' request for transfer motion is not in the interests of public policy nor is it enforceable pursuant to 28 U.S.C. § 1404(a). "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997), quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (1997). Rule 23 is also intended to maximize judicial efficiency and prevent inconsistent rulings from different district courts considering the same or similar facts. *See* Advisory Committee Notes, 1966 Amendment to Fed. R. Civ. P. 23(b)(1)(A) ("Separate actions by individuals…might create a risk of inconsistent or varying determinations.") (internal citations omitted).  For decades, federal courts throughout the United States have certified nationwide, multi-state, and state-wide classes under Rule 23, particularly in cases, such as this one, where the plaintiffs and absent class members all allege the same injury, arising out of the same wrongdoing on the part of the same defendants. *See, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (holding no abuse of discretion to certify nationwide class in class action challenging procedure for hearings prior to recoupment of social security overpayments); *Phillips Petroleum Co v. Shutts*, 472 U.S. 797, 820-21 (1985) (upholding Kansas courts' jurisdiction over nationwide and multi-state classes).[8]

---

[8] *See also Hansen v. Monumental Life Ins. Co.*, No. 05-CV-1905 JBA, 2008 U.S. Dist. LEXIS 112254, at *31 (D. Conn. Mar. 6, 2008) (certifying multi-state class); *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1066 (C.D. Cal. 2010)

1    Severing and transferring Plaintiff Pakka's claim would be at odds with the

2  objectives of Rule 23. All of the named Plaintiffs in this action bring identical claims

3  under the Securities Act of 1933, and all of the named Plaintiffs bring these claims

4  on behalf of a nationwide class of purchasers of "points" in Diamond's U.S. or

5  Hawaii collections.   Moreover, all of the Plaintiffs (and indeed, all the class

6  members), received similar aggressive sales pitches from Diamond salespeople, in

7  which they were told that Diamond points constituted an "investment" that would

8  appreciate in value, that they could easily sell their Diamond memberships and

9  points; and they could pass down their Diamond memberships to their children. ¶¶

10  99, 104, 106, 108, 114.   All of the Plaintiffs' claims arise from the same set of

11  operative facts and are brought under the same federal law. Thus, requiring Plaintiff

12  Pakka to litigate her claims in Hawaii, while the Dropp and Levine Plaintiffs litigate

13  their identical claims before this Court, would constitute a waste of judicial resources

14  and could potentially result in conflicting decisions from the two courts. Therefore,

15  the Diamond Defendants' motion to sever and transfer Plaintiff Pakka's claims

16  should be denied.

17

18

19

20

21  (predominance requirement of Rule 23(b)(3) met when proposed nationwide class

22  of individuals who bought Honda hybrid cars demonstrated that claims arose from
"common nucleus of facts and potential legal remedies"); *Simon v. Philip Morris,*

23  *Inc.*, 86 F. Supp. 2d 95, 124-25 (E.D.N.Y. 2000) (certifying nationwide class of

24  smokers, finding that "[t]hose plaintiffs who cannot independently meet the 'injury

25  in New York' requirement may rely on the factual and jurisdictional links of
proposed class members who were injured here."); *Horton v. USAA Cas. Ins. Co.,*

26  266 F.R.D. 360, 364 (D. Ariz. 2009) (finding that the argument that a district court

27  lacks jurisdiction to certify a nationwide class is "frivolous," as a "federal court
applying Rule 23 of the Federal Rules of Civil Procedure may certify a nationwide

28  class if the requirements for certification are satisfied").

**D.** **Plaintiff Pakka Consents to Transfer In the Event That the Motions to Dismiss Are Granted**

In the event that this Court grants Defendants' Motions to Dismiss the Dropp and Levine Plaintiffs' claims, Plaintiff Pakka will consent to the severance and transfer of her claims to the District of Hawaii, as many of the considerations set forth above will no longer apply.

**CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that the Court: (1) deny the Defendants' motions to compel arbitration of the Levine and Dropp Plaintiffs' claims; (2) deny the Defendants' motions to dismiss the Levine and Dropp Plaintiffs' claims; (3) deny the Defendants' motions to strike the Levine and Dropp Plaintiffs' class action allegations; and (4) deny the Defendants' motions to sever and transfer Plaintiff Pakka's claims.

Dated: May 15, 2018

ALBRIGHT, STODDARD, WARNICK
  & ALBRIGHT

G. MARK ALBRIGHT (NV #001394)
D. CHRIS ALBRIGHT, ESQ. (NV #004904)
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada 89106

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
LAWRENCE P. KOLKER (pro hac vice pending)
LYDIA KEANEY REYNOLDS (pro hac vice pending)
270 Madison Avenue
New York, NY 10016

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Albright, Stoddard, Warnick & Albright, and that on the _15_ day of May, 2018, I served a true and correct copy of the foregoing **PLAINTIFFS' MEMORADUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION, MOTIONS TO DISMISS, MOTIONS TO STRIKE CLASS ALLEGATIONS, AND MOTION TO SEVER PLAINTIFF PAKKA'S CLAIMS** upon all counsel of record by electronically serving the document using the Court's electronic filing system.

_____
An employee of Albright, Stoddard,
Warnick & Albright

28